**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ANGEL MALDONADO,

                              Plaintiff,

              v.                                                    No. 12-CV-1290
                                                                   (LEK/CFH)
DR. WELLS, DR. RAMINENI,

                              Defendants.

_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**


**APPEARANCES:**                                    **OF COUNSEL:**


ANGEL MALDONADO
Plaintiff Pro Se
11-A-5408
Fishkill Correctional Facility
P.O. Box 1245
Beacon, New York 12508

HON. ERIC T. SCHNEIDERMAN                COLLEEN D. GALLIGAN, Esq.
Attorney General of the State of New York     Assistant Attorney General
Litigation Bureau
The Capitol
Albany, New York 12224
Attorney for the Defendants


### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff  pro se Angel Maldonado ("Plaintiff"), an inmate in the custody of the New

York State Department of Corrections and Community Supervision ("DOCCS"), brings this

_____

        [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636 (b) and N.D.N.Y.L.R. 72.3 (c).

action pursuant to 42 U.S.C. § 1983 alleging that defendants, Dr. Wells and Dr. Ramineni, violated his constitutional rights under the Eighth Amendment.  Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 48.  Plaintiff opposes this motion.  Dkt. No. 61.  Defendants filed a reply.  Dkt. No. 62.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background[2]

The facts are reviewed in the light most favorable to plaintiff as the nonmoving party. See subsection II(A), infra.  At all relevant times, plaintiff was incarcerated at Mid-State Correctional Facility ("Mid-State").  Plaintiff claims that Dr. Wells and Dr. Ramineni violated his Eighth Amendment right to adequate medical care by failing to treat his possible MRSA infection and not providing him with adequate pain medication.  Dkt. No. 1 at 11; Dkt. No. 48-2 at 58.

## A. Statement of Facts

Plaintiff had been stabbed four times in 2001 and subsequently underwent surgery to check for internal injuries.  Dkt. No. 48-2 at 44.  He also suffers from asthma and hepatitis C.  Dkt. No. 49-1 at 33.

On or about March 9, 2012, Dr. Wells first saw plaintiff who had complaints of abdominal pain and a history of abdominal stab wound.  Dkt. No. 49 at ¶6.  Dr. Wells determined that plaintiff had a ventral hernia that needed surgical repair.  Id.  Dr. Wells

---

[2] All unpublished cases cited within this Report-Recommendation and Order are attached.

performed ventral hernia repair on April 11, 2012 at Upstate University Hospital ("Upstate"). Id. at ¶7. Upon discharge from Upstate, plaintiff was admitted to the infirmary at Mid-State, and non-defendant physician Dr. Vadlamundi prescribed plaintiff Tylenol # 3 for pain management, as well as an abdominal binder. Dkt. No. 50 at ¶¶10-11.

Upon discharge from the infirmary on April 12, 2012, plaintiff was prescribed ibuprofen for pain for three days and was scheduled to follow up with Dr. Ramineni on April 19, 2012. Dkt. No. 50 at ¶18. On April 13, nursing staff at Mid-State changed plaintiff's dressing and noted that plaintiff's staples were dry and intact. Id. at ¶20. On April 14, plaintiff was given a body check due to a fight with another inmate. Id. at ¶21. At that time, it was noted that plaintiff had a small amount of bloody drainage at his incision site, and he was admitted to the infirmary. Id. at ¶21. Non-defendant physician Dr. Vadlumondi ordered that a culture of plaintiff's wound be taken, and that plaintiff be placed on Keflex prophylactically to treat a possible infection. Id. at ¶22.

On April 16, 2012, plaintiff had no drainage, denied pain, and requested to be discharged from the infirmary. Dkt No. 50 at ¶23. Dr. Ramineni saw plaintiff that day and noted no evidence of discharge or infection from the incision site, but ordered that plaintiff continue on Keflex prophylactically and be discharged from the infirmary. Id. at ¶23. Plaintiff was seen at emergency sick call the next day, complaining of drainage from his abdominal incision, and drainage of yellow serous fluid just above his navel was noted.[3] Id. at ¶24. Plaintiff was placed on antibiotics and was issued band aids. Id.

On April 19, 2012, a culture taken from plaintiff's incision tested positive for Methicilin

---

[3] The drainage of serous fluid is caused by a seroma, which is a pocket of fluid that can develop after a surgical procedure. A seroma is not uncommon and usually resolves on its own. Dkt. No. 50 at ¶24.

Resistant Staph Aureus ("MRSA").[4]  Dkt. No. 50 at ¶25.  The next day, Dr. Ramineni saw plaintiff, and noted that plaintiff's wound was clean and dry and that the staples were intact. Id. at ¶26.  Dr. Ramineni noted that plaintiff's lab report was positive for MRSA.  Id.  He also noted that plaintiff had no discharge or other signs of infection at that time, and indicated that plaintiff should follow up within one week.  Id.

Dr. Ramineni saw plaintiff on April 24, 2012, and noted that plaintiff's wound was healing and there was no evidence of infection.  Dkt. No. 50 at ¶29.  At that time, Dr. Ramineni removed plaintiff's staples, cleaned his wound, and applied Betadine and a large band aid.  Id.  Plaintiff was seen later that morning by nursing staff with a small amount of reddish, tan drainage on the suture site where staples were removed.  Id. at ¶30.  Plaintiff was advised to return to the infirmary if his symptoms worsened, he had a fever, or the wound drainage increased or changed.  Id.  Plaintiff was also given ibuprofen to be taken as needed.  Id.

Later that afternoon, plaintiff was seen at emergency sick call with an approximately one inch wound dehiscence and dark bloody drainage.  Dkt. No. 50 at ¶31.  Plaintiff's vital signs were obtained and pressure was applied to his wound.  Id.  Plaintiff was sent to St. Luke's Hospital ("St. Luke's") via ambulance.  Id.  Plaintiff returned from St. Luke's Hospital later that day.  Id. at ¶32.  Upon his return to Mid-State, plaintiff's wound was still draining red blood.  Id. at ¶32.  Non-defendant Mid-State physician Dr. Zaki ordered that plaintiff be sent to the emergency room at Upstate for evaluation and to be seen by Dr. Wells.  Id.  That same day, plaintiff arrived at Upstate complaining of drainage, opening of the midline

---

[4] MRSA is a bacterium that is resistant to many antibiotics.  Dkt. No. 49 at ¶13.

incision, and abdominal pain.  Dkt. No. 49 at ¶9.  General surgery was consulted, and

plaintiff underwent a CT scan of the abdomen.  Id.  Plaintiff was diagnosed with incisional

hernia wound site dehiscence and seroma.  Id.  Infection of the incision site could not be

ruled out by the CT scan, and plaintiff was prophylactically placed on intravenous

antibiotics.  Id. at 12.  Plaintiff was not diagnosed with an infection of the incision site.  Id.

Plaintiff was discharged from Upstate on April 27, 2012 with no activity restrictions other

than those given to him in the postoperative period.  Id. at ¶¶ 13-14.  Given plaintiff's

questionable history of MRSA, he was discharged with Bactrim (an antibacterial medication)

to be given twice daily until his scheduled follow-up appointment with Dr. Wells.  Id. at ¶13.

Upon return to Mid-State on April 27, 2012, plaintiff was admitted to the infirmary.

Dkt. No. 50 at ¶37.  Plaintiff was placed on contact precautions due to his history of MRSA,

which included a positive culture on April 19, 2012, but negative cultures during his

admission to Upstate from April 24, 2012 through April 27, 2012.  Id.  Upon admission to the

infirmary on April 27, Dr. Ramineni ordered that plaintiff be given Tylenol # 3 as needed for

three days.  Dkt. No. 50 at ¶38.  During plaintiff's stay in the infirmary from April 27, through

May 2, plaintiff's dressings were changed daily.  Id. at ¶39.  Plaintiff's wound healed, and he

was discharged to general population by non-defendant Mid-State physician, Dr.

Rabinowitz, on May 2.  Id.

Plaintiff was next seen at sick call on May 8, 2012.  Dkt. No. 50 at ¶40.  At that time,

his wound was clean and healing well.  Id.  Although he had a small amount of serous

drainage, according to Dr. Ramineni, it was not medically serious and was expected to

resolve on its own.  Id.  On May 11, 2012, Mid-State received a call from Walsh Regional

Medical Unit ("Walsh"), requesting to see plaintiff regarding his hernia repair.  Id. at ¶42.

Plaintiff was sent to Walsh that day.  Id.

At Walsh, Dr. Wells saw plaintiff for a follow-up visit, at which time, plaintiff showed no signs of infection and his wound was closing with no further seroma drainage.  Dkt. No. 49 at ¶15.  According to Dr. Wells, "[p]laintiff indicated he still had discomfort from the hernia repair and was advised to use the support garment."  Id.  Dr. Wells indicated that plaintiff should be rechecked in one month.  Id.

Plaintiff was next seen at sick call on May 31, 2012, complaining of pain and swelling.  Dkt. No. 50 at ¶44.  According to Dr. Ramineni, "[u]pon assessment no drainage was present and the wound opening was clean and dry" and "[p]laintiff's temperature was normal and [he] was advised to continue using the abdominal binder."  Id.  Plaintiff was next seen by Dr. Wells on June 8, 2012.  Dkt. No. 49 at 16.  At that time, Dr. Wells found that plaintiff had post-operative seroma, but no infection.  Id.  He also noted that plaintiff had a remaining area of induration over the mesh which was slowly resolving, and concluded that plaintiff could resume his work duties.  Id.  Dr. Wells had no further involvement with plaintiff's medical care.  Id. at ¶17.

On June 21, 2012, plaintiff was seen at sick call concerned about his blood pressure and complaining of dizziness.  Dkt. No. 50 at ¶47.  According to Dr. Ramineni, assessment revealed that plaintiff's incision line had healed and there was no drainage.  Id.  Plaintiff's medical records indicate that after June 21, plaintiff made no further complaints concerning his hernia repair, no further treatment regarding his hernia repair was indicated, and no further treatment regarding his hernia repair was provided.  Id. at ¶48.

## II. Discussion

Plaintiff contends that defendants Dr. Ramineni and Dr. Wells were deliberately indifferent to his medical needs in violation of the Eighth Amendment through their failure to treat his possible MRSA infection and in denying him adequate pain relief medication.

## A. Summary Judgment Standard

In order for a motion for summary judgment to be granted, the movant must show that (1) there is no genuine issue of any material fact, and (2) the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C); Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2nd Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," . . . that a *pro se* litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent," with the *pro se* litigant's allegations . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by *pro se* litigants," . . . and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when a plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'") (citations omitted).  However, mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly-supported motion; the

requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-

48.

Defendants Dr. Wells and Dr. Ramineni move for summary judgment, contending

that plaintiff cannot establish that (1) he suffered from a serious medical need, or (2)

defendants acted with deliberate indifference to that medical need.  Dkt. No. 48-3 at 1.


### B. Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment."  U.S. CONST. amend. VIII.  The prohibition against cruel and unusual

punishment includes the right to be free from conditions of confinement that impose an

excessive risk to an inmate's health or safety.  Farmer v. Brennan, 511 U.S. 825, 834, 837

(1994); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  A viable Eighth Amendment

claim is twofold; the plaintiff must demonstrate both objective and subjective components.

Farmer, 511 U.S. at 834.  The objective question asks whether the deprivation of which the

inmate complains was sufficiently serious.  Id.  This component "requires a court to assess

whether society considers the risk that the prisoner complains of to be so grave that it

violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."

Helling v. McKinney, 509 U.S. 25, 36 (1993).  Thus, the prisoner must show that "the risk of

which he complains is not one that today's society chooses to tolerate."  Id. at 36.  The

subjective component requires the inmate to show that the defendant demonstrated

deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Farmer, 511 U.S. at 834. The Supreme Court of the United States has held that, "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in Estelle [v.Gamble]." Wilson v. Seiter, 501 U.S. 294, 303 (1991). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

### i. Serious Medical Condition

The Eighth Amendment extends to the provision of medical care. Hathaway, 37 F.3d at 66. "'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the

case. Smith, 316 F.3d at 185.

In Whitcomb v. Todd, the Court indicated,

> [I]t is clear that a reasonable medical professional would recommend treatment for this condition as Whitcomb was attended by nurses and physicians multiple times per day. Furthermore, this condition allegedly affected Whitcomb's ability to bathe and, at a minimum, required him to pause whatever he was undertaking throughout the day to undergo multiple wound dressing changes and the administration of antibiotics. While it is unclear whether the pain was substantial, there is little dispute that it was chronic.

Whitcomb v. Todd, No. 04-CV-223 (LEK/DRH), 2008 WL 4104455, at *10 (N.D.N.Y. Sept. 3, 2008). Thus, the Court in Whitcomb concluded that the plaintiff's condition constituted a serious medical condition. Id.

Here, the April 19, 2012 culture tested positive for MRSA. Dkt. No. 50 at ¶25. However, the following day, Dr. Ramineni saw plaintiff and noted that he had no signs of infection, and indicated that the he should follow up within one week. Id. at ¶26. Dr. Ramineni saw plaintiff on April 24, removed plaintiff's staples, cleaned plaintiff's wound, and applied Betadine and a large band aid. Id. at ¶29. Plaintiff was seen later that morning by nursing staff, and he was given ibuprofen to be taken as needed for pain management. Id. at ¶30. Later that afternoon, plaintiff was seen at emergency sick call, and he was sent to St. Luke's via ambulance. Id. at ¶31. When plaintiff returned to Mid-State later that day, he was sent to the emergency room at Upstate to be seen by Dr. Wells. Id. at ¶32. General surgery was consulted, plaintiff underwent a CT scan of the abdomen, was diagnosed with incisional hernia wound site dehiscence and seroma, and was prophylactically placed on intravenous antibiotics. Dkt. No. 49 at ¶¶9, 12. Plaintiff was discharged from Upstate on April 27, 2012 with Bactrim to be given twice daily, until his scheduled follow up with Dr.

Wells.  Id. at ¶13.

Here, defendants closely monitored plaintiff, routinely cleaned the infection site and dressings, kept close watch on plaintiff with a series of follow-up appointments, and prescribed plaintiff medicine – both prophylactically and for pain management.  Both the level of care and precautionary measures taken demonstrate that plaintiff's possible MRSA infection is a condition which a reasonable patient and doctor would consider "important and worthy of comment or treatment," as considered by the first factor in determining the seriousness of the inmate's medical condition.  Whitcomb, 2008 WL 4104455 at *10 (citing Brock, 315 F.3d at 162-63).

Additionally, defendants Dr. Wells and Dr. Ramineni placed plaintiff on contact precautions due to his history of MRSA, which included a positive culture on April 19, 2012, but negative cultures during his admission to Upstate from April 24, through April 27.  Dkt. No. 50 at ¶37.  As in Whitcomb, the precautions taken and frequent medical care and follow-up demonstrate that this medical condition significantly affects plaintiff's daily activities.  Whitcomb, 2008 WL 4104455 at *10.

Addressing the final factor, existence of chronic and substantial pain, that plaintiff returned to sick call several times complaining of pain, and the medical providers gave him additional medication each time, demonstrates the existence of pain as a result of plaintiff's medical conditions.  Brock, 315 F.3d at 162-63.  In Crum v. Marini, the Court indicated that "where there is some evidence that the severe pain the inmate complains of may be real, it is not appropriate to dismiss such complaints on the grounds that they are 'subjective.'" Crum v. Marini, No. 06-CV-0513 (GLS/DRH), 2007 WL 3104750, at *3 (N.D.N.Y. Oct. 22, 2007).  Here, as plaintiff repeatedly sought medical care for his complaints of pain, there

exists a question of fact as to the existence of chronic and substantial pain.

Therefore, the above facts taken together, indicate the possibility of MRSA in plaintiff's incisional wound, and constitute a serious medical condition for a medical indifference claim.

### ii. Deliberate Indifference

To satisfy the subjective component for claims of inadequate medical care, the plaintiff must prove that the defendants acted with deliberate indifference. Farmer, 511 U.S. at 834. As discussed, deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 703. Because the prison official must have had knowledge of the risk, the prison official must have been "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05. It has been established that "[d]eliberate indifference is 'a mental state equivalent to subjective recklessness,' and requires that the defendant 'act or fail to act while actually aware of a substantial risk that serious inmate harm will result," and, therefore, "[m]ere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Crum, 2007 WL 3104750 at*4 (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)). Thus, "disagreements over medications, diagnostic techniques (e.g. the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health. Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Plaintiff contends that (1) defendant doctors knew of the presence of his infection

and (2) failed to treat it adequately. The Court in <u>Crum</u>, found that "[t]here is no evidence, beyond [the plaintiff's] conclusory allegations, that [his] medical needs were ignored," where the plaintiff's "medical records indicate that he was evaluated by various medical personnel on numerous occasions during his time at [the correctional facility]; that he was prescribed medication for his pain; that he was given x-rays and MRIs; and that defendant [doctor] periodically reviewed his medical records." <u>Crum</u>, 2007 WL 3104750 at *4. Similarly, the Court in <u>Atkinson v. Fisher</u>, held that, where "[p]laintiff was evaluated by medical personnel frequently, prescribed pain medication, and given X-rays" and defendant doctors "periodically examined him and reviewed his medical records . . . [p]laintiff has not raised a genuine issue of material fact that [d]efendants were deliberately indifferent to his serious medical need." No. 07-CV-368 (GLS/GHL), 2009 WL 3165544, at *13 (N.D.N.Y. Sept. 25, 2009).

In the present case, defendants contend that, although an infection could not be ruled out, plaintiff was never actually diagnosed with having an infection. Dkt. No. 49 at ¶12. Further, they point out that, in response to plaintiff's "questionable history with MRSA," he was prescribed antibacterial medication, scheduled for follow-up visits, and transported between locations. Dkt. No. 50 at ¶¶ 22-25, 31, 34, 36. Additionally, defendants opine that plaintiff's cultures of his wound were continuously re-tested. <u>Id.</u> at ¶¶ 22-23, 25, 34. His wound was also cleaned several times and his dressing changed while he was in the infirmary. <u>Id.</u> at ¶39.

It is clear that defendants took measures to treat and avoid the harm of the possible infection, including prescribing pain medication, including antibacterial medication, cleaning the wound, keeping plaintiff in the infirmary for days at a time, instructing him on how to

treat his wound, scheduling follow-up visits, and re-testing the incision site. Dkt. No. 50 at ¶¶29, 34, 36, 37, 39. These measures sufficiently prove that defendants did not "disregard[] the prisoner's serious medical needs," nor did they deny or delay plaintiff medical care. Chance, 143 F.3d at 703; Estelle, 429 U.S. at 104. Therefore, plaintiff had failed to demonstrate that defendants were deliberately indifference to his serious medical condition.

Insofar as plaintiff argues that the medications defendants prescribed to him for pain management were inadequate, defendants' choice to treat plaintiff's pain with Tylenol #3 and Ibuprofen, is entirely within their discretion. Sonds, 151 F.Supp at 312 (S.D.N.Y. 2001). This is merely a "disagreement over medications," and, therefore, "does not create a constitutional claim." Id.; Chance, 143 F.3d at 703 (2d Cir. 1998).

The above facts, taken together, demonstrate that defendants had knowledge of plaintiff's serious medical condition and took sufficient measures to avoid the risk of harm posed by the presence of MRSA in his incisional wound. Therefore, plaintiff fails to demonstrate that defendants were deliberately indifferent to his serious medical needs.

### III. CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED**, and plaintiff's claim be **DISMISSED** as to all claims and all defendants; and it is further

**ORDERED** that the Clerk serve a copy of the Report-Recommendation and Order on the parties in accordance with local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).


Dated:  April 23, 2015
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

2009 WL 3165544
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John R. ATKINSON, III, Plaintiff,

v.

Brian FISCHER, Acting Commissioner, N.Y. State
Department of Correctional Services; John J.
Donelli, Superintendent, Bare Hill Correctional
Facility; Dr. Ira Weissman, Facility Physician,
Bare Hill Correctional Facility, Defendants.

No. 9:07–cv–00368 (GLS/
GHL).    |    Sept. 25, 2009.

West KeySummary

**1**    **Prisons**
👉 Disability or Illness

**Sentencing and Punishment**
👉 Medical Care and Treatment

An inmate failed to state an Eighth Amendment
claim for deliberate indifference when he was
assigned a top bunk placement as there were
no facts available to prison officials from which
they could have drawn the inference that he
required a bottom bunk placement upon his
transfer to their facility. It was undisputed
that his transfer paperwork made no mention
of requiring a bottom bunk bed. The inmate
asserted he had reported vertigo to physicians but
that information did not appear on his transfer
records. Prison officials placed him into a bottom
bunk after he fell from the top bunk. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983; Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**Attorneys and Law Firms**

John R. Atkinson, III, Bayport, NY, pro se.

Hon. Andrew Cuomo, New York Attorney General, Steven
H. Schwartz, Assistant Attorney General, of Counsel,
Syracuse, NY, for the Defendants.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Steven H. Schwartz, Esq., of Counsel, Albany,
NY, for Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

**I.** *Introduction*

**\*1**    The above-captioned matter comes to this court
following a Report–Recommendation and Order (R & R) by
Magistrate Judge George H. Lowe, filed July 10, 2009. (Dkt.
No. 44.) The R & R [1] recommended that defendants' motion
for summary judgment be granted in its entirety. Pending are
Atkinson's objections to the R & R. (Dkt. No. 45.) For the
reasons that follow, the R & R is adopted in its entirety.

**II.** *Background*

John R. Atkinson, III, a former inmate at Bare Hill
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983, alleging that defendants violated his constitutional
rights when he was: (1) assigned to a top bunk despite
a physical impairment allegedly entitling him to a bottom
bunk; [2] (2) assigned to a job requiring manual labor despite
his impairment; denied adequate medical care; and (4)
discriminated against in the provision of medical care. (*See
generally* Am. Compl., Dkt. No. 7.) Defendants moved
for summary judgment, arguing *inter alia* that Atkinson
failed to allege defendants' personal involvement in any
unlawful conduct, and that Atkinson's claims regarding bunk
placement, job assignment, and inadequate medical care are
meritless.

On July 10, 2009, Magistrate Judge Lowe recommended dismissal of all of Atkinson's claims. The court will now review the R & R and the objections raised by Atkinson.

## III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 **WL** 149049, at *6–7 (N.D.N.Y. Jan.18, 2006).* In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the magistrate judge's findings and recommendations for clear error. *See id.*

## IV. *Discussion*

### A. *Bunk Placement Claim*

In recommending the dismissal of Atkinson's bunk placement claim, Judge Lowe explained that "there were no facts available to Defendants from which they could have drawn the inference that Plaintiff required a bottom bunk placement upon his transfer to Bare Hill Correctional Facilty" and that there "is no evidence that Defendants actually drew that inference." (*See* R & R at 20, Dkt. No. 44.) Atkinson responds that although defendants may not have initially known of his need for a bottom bunk, "other exhibits show that when the *facility* was made aware of the need for a bottom bunk ... it took two years to get it." (*See* Objections at ¶ 4(a), Dkt. No. 45 (emphasis added).) This two-year delay, he claims, "meets the deliberate indifference standard." (*Id.* at ¶ 4(g).) The court will review this portion of the R & R de novo. *See Almonte,* 2006 **WL** 149049, at *6–7.*

 *2 Upon de novo review, the court concurs with Judge Lowe's findings as to Atkinson's bunk placement claim. Initially, Atkinson's claim that it took the facility two years to provide a bottom bunk is belied by the record.³ Moreover, even crediting Atkinson's argument that the facility knew of and failed to address his need for a bottom bunk, there is, as Judge Lowe explained, no evidence that defendants

were personally aware of that need or that they deliberately disregarded it. Accordingly, the court adopts the portion of the R & R dismissing Atkinson's bunk placement claim.

### B. *Job Assignment*

Judge Lowe next recommended the dismissal of Atkinson's job assignment claim, explaining that "there is no evidence ... that any of the named Defendants were involved at all in the decision to assign Plaintiff to the porter job, much less that in doing so they were deliberately indifferent." (R & R at 22, Dkt. No. 44.) In response, Atkinson contends that he was assigned to the porter job "after the *facility* knew Plaintiff was injured," thereby "showing deliberate indifference." (Objections at ¶ 4(e), Dkt. No. 45 (emphasis added).) The court will review this portion of the R & R de novo.

Upon de novo review, the court concurs with Judge Lowe's findings as to Atkinson's job assignment claim. Even crediting Atkinson's claim that the facility knew of his injury prior to the job assignment, there is no evidence that defendants were personally aware of the injury or involved in assigning the job to Atkinson. Accordingly, the court adopts the portion of the R & R dismissing Atkinson's job assignment claim.

### C. *Inadequate Medical Care Claim*

Judge Lowe next recommended the dismissal Atkinson's medical care claim. (*See* R & R at 25, Dkt. No. 44.) He found that while the delays Atkinson experienced in receiving medical attention were "somewhat troubling," they did not rise to the level required by the "deliberate indifference" standard. (*Id.* at 24.) Despite the imperfections of the system, he explained, "Plaintiff was evaluated by medical personnel frequently, prescribed pain medication, and given X-rays," and that "Dr. Ferrari and Dr. Weissman periodically examined him and reviewed his medical records." (*Id.* at 25.)

Atkinson's objections to this conclusion are somewhat unclear. He appears to claim only that Judge Lowe mischaracterized certain time periods related to his injury and treatment. Specifically, Atkinson identifies three treatment dates set forth in the "Background" section of the R & R and details the number of months that had passed between the time of his injury and each of those three dates. (*See*

Objections at ¶ 4(c), (d), (f), Dkt. No. 45 .) The court is unsure of what Atkinson is attempting to show with these statements. Upon comparing the time spans stated in Atkinson's objections with the chronology of Atkinson's treatment set out by Judge Lowe in the R & R, there is no meaningful discrepancy . [4] Moreover, Judge Lowe specifically acknowledged these delays and weighed their significance in drawing his final conclusion. (*See* R & R at 23–25, Dkt. No. 44.) And even if the medical care and treatment provided to Atkinson were in some way deficient, there exists no evidence in the record that defendants were in any way personally involved with providing or withholding that care and treatment. [5] Accordingly, the court adopts the portion of the R & R dismissing Atkinson's medical care claim. (*See* R & R at 25, Dkt. No. 44.)

**\*3** Finally, Atkinson has not objected to the remaining portions of the R & R. After review of those portions for clear error, the court finds no error and adopts the R & R's recommendations as to those portions.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Lowe's July 10, 2009 Report–Recommendation and Order is adopted in its entirety; and it is further

**ORDERED** that the Clerk provide copies of this Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff John R. Atkinson III alleges that Defendants Brian Fischer (the commissioner of the New York State Department of Correctional Services), John J. Donelli (the superintendent of Bare Hill Correctional Facility), and Dr. Ira Weissman (a physician at Bare Hill) violated his

constitutional rights by assigning him to a top bunk, assigning him to a job that required physical exertion, providing inadequate medical care, and providing preferential medical treatment to Jewish inmates. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 41.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. BACKGROUND

Plaintiff entered the New York State Department of Correctional Services ("DOCS") system on September 28, 2005. He was initially housed at Downstate Correctional Facility. (Dkt. No. 7 at ¶ 8.) Plaintiff alleges that he completed a brief medical history at Downstate in which he stated that he suffered from asthma, vertigo, and dizziness associated with his medication. (Dkt. No. 7 at ¶ 9.)

Plaintiff was transferred to Bare Hill Correctional Facility in October 2005. (Dkt. No. 7 at ¶ 10.) He alleges that he was assigned to a top bunk "even though history from Down[s]tate Facility should have classified him as a 'Medical Bottom.' " (Dkt. No. 7 at ¶ 11.) Plaintiff's transfer paperwork [1] made no mention of Plaintiff requiring a bottom bunk. (Dkt. No. 41–3, Defendants' Rule 7.1(a)(3) Statement at ¶ 8; Dkt. No. 43–2, Plaintiff's Opposition to Motion for Summary Judgment at ¶ 8.)

On January 16, 2006, Plaintiff fell from the top bunk. (Dkt. No. 41–3 at ¶ 2.) He hit his head and neck. (Dkt. No. 7 at ¶ 12.) Plaintiff was escorted to the infirmary, where he was given ibuprofen and sent back to his cell. (Dkt. No. 7 at ¶¶ 14–15.) An inmate injury report was prepared, in which it was noted that there was no swelling, that the skin was intact, that Plaintiff was alert and oriented, that Plaintiff's pupils were equal and reacted to light, and that Plaintiff denied pain or injuries in his extremities or trunk. (Dkt. No. 41–4, Defendants' Ex. A.)

**\*4** Sometime after the fall, Plaintiff was assigned to a bottom bunk. (Dkt. No. 7 at 28 [2] .)

Within a few days of the fall, Plaintiff alleges that he began experiencing severe headaches, neck aches, and dizziness.

(Dkt. No. 7 at ¶ 16.) Plaintiff requested x-rays of his neck. (Dkt. No. 7 at ¶ 19.)

The chronology of Plaintiff's requests for x-rays and his receipt of results is somewhat unclear. Plaintiff alleges that his neck was not x-rayed until five months after the fall. (Dkt. No. 7 at ¶ 21 .) Attachments to the complaint indicate that Plaintiff had requested x-rays before he fell, and that he received at least some x-ray results within a few days of the fall. For instance, in a grievance filed by Plaintiff on the day after his fall, Plaintiff stated that he had waited four months for an x-ray, that he had been told it would be reviewed in 10 days, and that it had been 30 days. Plaintiff also complained that he was very dizzy and experienced headaches every day. He stated that he "was told I would be seeing a doctor" and requested a response in writing "as to how long I have to wait to see a physician." (Dkt. No. 7, Ex. A.) Plaintiff was instructed to come to sick call, where the nurse would give him the results of his x-ray. There was no response regarding his request to see a doctor. *Id.* Plaintiff's medical records show that he was given the results of the x-ray on January 20, 2006. (Dkt. No. 41–11, Defendants' Ex. H at 16.)

Plaintiff's medical records show that he was seen on January 31, 2006. At that time he complained of headaches and dizziness since his fall. It was noted that he was already scheduled to see the doctor. (Dkt. No. 41–11, Defendants' Ex. H at 15.)

On February 1, 2006, Plaintiff wrote another letter asking when he would see a doctor. (Dkt. No. 7, Ex. A1.) The response was that he was "scheduled to see the facility doctor ... We do not give exact dates for call outs, sorry!" *Id.*

On February 2, 2006, Plaintiff filed a "Request for Interview or Information." In the request, he stated that he had been told that there was no history of vertigo listed in his charts. He stated that he had compiled a more complete medical history. (Dkt. No. 7, Ex. B.)

Plaintiff's medical records show that on March 21, 2006, he complained of pain in the back of his neck. (Dkt. No. 41–11, Defendants' Ex. H at 15.)

On April 1, 2006, Plaintiff filed a grievance. (Dkt. No. 7 at ¶ 22.) He stated that when he fell out of his bunk, he had been placed on the "infamous 5 plus month waiting list to

see the doctor ." He stated that his neck cracked each time he turned it and that he suffered daily headaches and dizziness. He complained that the only care he had received was motrin and ibuprofen. He stated that a nurse at sick call felt his neck and opined that there was something wrong with it and that he would probably be recommended for physical therapy. (Dkt. No. 7, Ex. C.)

 **\*5** Plaintiff's medical records show that on April 6, 2006, Plaintiff was seen by Dr. Ferrari, who ordered an x-ray of Plaintiff's spine. (Dkt. No. 41–11, Defendants' Ex. H at 14.)

In response to Plaintiff's April 1, 2006, grievance, Defendant Donelli stated that Plaintiff had been evaluated by a doctor on April 6, 2006. Donelli noted that "[x]-rays ordered at that time reveal degenerative changes at C6 and C7. No treatment was ordered at that time." (Dkt. No. 7 at ¶ 22, Ex. E.)

Plaintiff's medical records show that on June 2, 2006, Plaintiff complained of stiffness and pain in his neck that had lasted for several months. He claimed that his niece, who is a physical therapist, assessed his neck as being "distorted." Plaintiff was scheduled to see a doctor. (Dkt. No. 41–11, Defendants' Ex. H at 13.)

Plaintiff's medical records show that on July 21, 2006, Plaintiff complained of neck pain and stated that he had had some relief from ibuprofen. He was told to report to nurse sick call. A doctor's review regarding ibuprofen was ordered. (Dkt. No. 41–11, Defendants' Ex. H at 12.)

On August 11, 2006, Plaintiff filed a "Request for Interview or Information." He stated that since receiving Defendant Donelli's response to his April 1, 2006, grievance, he had been to the infirmary three times. Each time he was denied pain medication and told that a prescription had been ordered for him. He asked "when something is going to be done for me with regards to an injury I sustained at this facility?" (Dkt. No. 7, Ex. I.) On August 14, 2006, staff responded that Plaintiff was scheduled to see the doctor "very soon." *Id.*

Defendant Dr. Weissman examined Plaintiff on August 14, 2006. Plaintiff had pain on neck flexing and minimal tenderness elsewhere. Based on the examination and Plaintiff's medical record, Dr. Weissman diagnosed Plaintiff with moderate to severe degenerative disc space disease. Dr. Weissman prescribed Naprosyn (an anti-inflammatory

Federico, Anna 4/22/2015
For Educational Use Only

drug,) Robaxin (a muscle relaxant), and lab work. (Dkt. No. 41–15, Weissman Aff. at ¶ 6.) Plaintiff alleges that Dr. Weissman told Plaintiff to notify him if there were any adverse side effects or if the medication failed to relieve Plaintiff's symptoms. (Dkt. No. 7 at ¶¶ 26–27.)

Plaintiff's medical records show that on September 6, 2006, Plaintiff reported that the medication was not giving him any relief. He was scheduled for a doctor's call out. (Dkt. No. 41–11, Defendants' Exhibit H at 12.)

Plaintiff's medical records show that on September 19, 2006, Plaintiff again complained of constant neck pain and stated that the medications were not effective. The medical record states that Plaintiff "is scheduled to see MD." (Dkt. No. 41–11, Defendants' Ex. H at 11.)

In September 2006, Plaintiff was assigned a job that required him to sweep, mop, and shovel snow. The job caused him physical pain and he filed a grievance requesting a new assignment. (Dkt. No. 7 at ¶ 41, Ex. J.) The grievance was denied by R. Donaldson. The response stated that Plaintiff needed "to contact medical in order to be evaluated for potential restrictions. Without standing restrictions, [Plaintiff] must program as instructed. Failure to program may result in disciplinary sanctions." (Dkt. No. 7, Ex. L.)

 **\*6** On October 4, 2006, Plaintiff wrote to Dr. Lester Wright, the Chief Medical Officer, asking to be reclassified to a bottom bunk and limited work status. (Dkt. No. 7, Ex. H.) Dr. Wright's office responded that Plaintiff was "approved to see the facility physician" and that it "appears that your medical needs are being met." (Dkt. No. 7 at 26 [3].) A month later, Dr. Wright's office sent Plaintiff an identical letter. (Dkt. No. 7 at 27 [4].)

On December 6, 2006, the Central Office Review Committee noted that Plaintiff was no longer assigned to the porter position or to a top bunk, but that "there is no medical necessity for a program restriction or bottom bunk permit." (Dkt. No. 7 at 28 [5].)

Plaintiff's complaint alleges that he sent a letter to Defendant Fischer, who responded that Plaintiff's needs were being met. (Dkt. No. 7 at ¶¶ 35–36.) In his opposition to the motion for summary judgment, Plaintiff states that he actually sent this letter to and received a response from former DOCS Commissioner Glenn Goord. (Dkt. No. 43–2 at ¶ 7.)

Plaintiff's medical records show that he saw Dr. Weissman on January 31, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 8.) In an affidavit filed in support of Defendants' motion for summary judgment, Dr. Weissman states that Plaintiff's symptoms "were similar to those he revealed previously, and my diagnosis was similar, as well. Therefore, I continued the Naprosyn, but prescribed Flexeril in place of Robaxin, as it is a more powerful muscle relaxant." (Dkt. No. 41–15 at ¶ 7.)

Plaintiff alleges that the Flexeril did not relieve his pain and caused psychological side effects. (Dkt. No. 7 at ¶ 39.) Plaintiff's medical records show that on February 7, 2007, he directed a "Request for Interview or Information" to Dr. Weissman, requesting that he be allowed to return all of the medications in his possession and "move forward without drugs." (Dkt. No. 41–11, Defendants' Ex. H at 7.) Dr. Weissman discontinued the Flexeril on February 19, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 8; Dkt. No. 41–15 at ¶ 7.)

Dr. Weissman states that he recommended physical therapy for Plaintiff after seeing him on January 31, 2007. (Dkt. No. 41–15 at ¶ 7.) Plaintiff alleges that eighteen months after sustaining his injury, he was taken to Franklin Correctional Facility, where he was left shackled and handcuffed for four hours before seeing a therapist. (Dkt. No. 7 at ¶ 42.) He was then told to return in two weeks. (Dkt. No. 7 at ¶ 43.) Plaintiff alleges that the physical therapist told Plaintiff that he was recommending a neck brace. *Id.*

Plaintiff's medical records show that he attended physical therapy on February 28, March 26, March 28, April 4, April 9, April 11, April 18, and April 25, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 2–4, 6.)

Plaintiff's medical records show that on May 8, 2007, Plaintiff complained that he had not been to physical therapy since April 25. (Dkt. No. 41–11, Defendants' Ex. H at 2.)

 **\*7** Plaintiff alleges that he went to sick call on May 24, 2007. (Dkt. No. 7 at ¶ 44.) He was told that there was no record of a prescription for a neck brace and that because he had one physical therapy session left, he could not apply for a renewal. *Id.* Plaintiff's medical records show that at this

sick call session, Plaintiff complained that he had not been to physical therapy since April 25. The nurse noted that Plaintiff should have one physical therapy session remaining. (Dkt. No. 41–11, Defendants' Ex. H. at 1 .)

Plaintiff's medical records show that he reported continued neck pain on May 29, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 1.)

Plaintiff alleges that throughout this period he was denied ibuprofen on numerous occasions. (Dkt. No. 7 at ¶ 32.)

Plaintiff alleges that a Jewish inmate told him that he never waited more than a few days to see a doctor because "Jews take care of their own." Plaintiff alleges that "[i]f the inmate's claim is true, Dr. Weismann ... would be guilty of discrimination." (Dkt. No. 7 at ¶ 47.)

Plaintiff's complaint requests a second opinion about his medical condition, an MRI, $400,000 in compensatory damages, $1 million in punitive damages, and payment for future medical needs. (Dkt. No. 7 at ¶ 55.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7] In determining whether a genuine issue of material [8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [9]

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [10] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [11] or (2) a challenge to the legal cognizability of the claim. [12]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the

grounds upon which it rests." [13] The main purpose of this rule is to "facilitate a proper decision on the merits." [14] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [15]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not *shown*— that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [16] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [17] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [18] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [19] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss

without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [20] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [21] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [22]

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [23] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [24] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [25] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [26]

## III. ANALYSIS

### A. Official Capacity

Plaintiff has sued Defendants in their individual and official capacities. (Dkt. No. 7, caption.) Defendants argue that the claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 41–16 at 2–3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth.*

*v. Metcalf,* 506 U.S. 139, 142–47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacitiesn. [27] All DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

Here, the face of the complaint alleges that each Defendant has an official position with DOCS. (Dkt. No. 7 at ¶¶ 3–5.) Therefore, any claims against the Defendants in their official capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants in their official capacities.

## B. Claims Regarding Top Bunk Placement

**\*10** Plaintiff claims that his constitutional rights were violated when he was assigned to a top bunk upon his transfer to Bare Hill Correctional Facility, resulting in his fall two months later. (Dkt. No. 7 at ¶ 11.) Defendants argue that Plaintiff has not raised a genuine issue of material fact that the top bunk placement violated Plaintiff's constitutional rights. (Dkt. No. 41–16 at 12–13.) Defendants are correct.

Plaintiff's claim regarding his top bunk placement can be analyzed either as an Eighth Amendment conditions of confinement claim or an Eighth Amendment medical care claim. In order for Plaintiff to succeed on either claim, he must show that the defendants acted with deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Deliberate indifference to a condition of confinement exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, to establish medical deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703.

Here, Plaintiff cannot raise a genuine issue of material fact that Defendants acted with deliberate indifference regarding his top bunk placement. It is undisputed that when Plaintiff transferred to Bare Hill Correctional Facility from Downstate Correctional Facility on October 21, 2005, his transfer paperwork made no mention of Plaintiff requiring a bottom bunk. (Dkt. No. 41–3, Defendants' Rule 7.1(a)(3) Statement at ¶ 8; Dkt. No. 43–2, Plaintiff's Opposition of Motion for Summary Judgment at ¶ 8.) Plaintiff asserts that he had reported vertigo to physicians at Downstate, but that information does not appear in his transfer records. *Id.* Rather, the transfer records show only that Plaintiff complained of pain in his lower back and shoulder. (Dkt. No. 41–10, Defendants' Ex. G at 3.) As a result, there were no facts available to Defendants from which they could have drawn the inference that Plaintiff required a bottom bunk placement upon his transfer to Bare Hill Correctional Facility. Further, there is no evidence that Defendants actually drew that inference. Moreover, Defendants placed Plaintiff in a bottom bunk sometime after the fall. (Dkt. No. 7 at 28.) Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim regarding his top bunk placement.

## C. Claims Regarding Porter Position

**\*11** Plaintiff claims that his constitutional rights were violated when he was assigned to a porter position in September 2006. (Dkt. No. 7 at ¶ 41.) Defendants argue that Plaintiff has not raised a genuine issue of material fact. (Dkt. No. 41–16 at 13–14.) Defendants are correct.

Defendants have addressed this claim as a due process issue. Defendants correctly note that prisoners do not have a liberty interest in the job of their choice. *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996). However, that fact is relevant only in cases where prisoners claim that they have been removed from a job against their will, for instance by being confined to the SHU. Here, Plaintiff's claim is *not* that he was removed from the job of his choice but rather that he was forced to do a job that he claims he was physically unable to perform. Therefore, I find that the claim is more appropriately addressed as an Eighth Amendment medical care issue.

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

At the time he was assigned to the porter position, Plaintiff had been diagnosed with degenerative disc disease. (Dkt. No. 41–15 at ¶ 6.) Degenerative disc disease can be classified as a serious medical condition, particularly if the pain associated with it lasts for an extended period of time.

*Mendoza v. McGinnis,* No. 05–CV–1124 (TJM/DEP), 2008 WL 4239760, at \*10 (N.D.N.Y. Sept.11, 2008); *Harris v. Morton,* No. 9:05–CV–1049 (LEK/RFT), 2008 WL 596891, at \*3 (N.D.N.Y. Feb.29, 2008) [28]. Plaintiff alleges that he suffered from back and neck pain for an extended period of time.

Even if one classifies Plaintiff's condition as sufficiently serious, however, there is no evidence that the named defendants were deliberately indifferent to that condition. There is no evidence before the Court that any of the named Defendants were involved at all in the decision to assign Plaintiff to the porter job, much less that in doing so they were deliberately indifferent. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ) . [29] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [30] Here, there is no evidence that Defendants Donelli, Weissman, or Fischer were in any way involved with Plaintiff's job assignment. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claims regarding his job assignment.

### D. Medical Care

**\*12** Plaintiff claims that Defendants violated his Eighth Amendment right to medical care. (Dkt. No. 7 at ¶¶ 45–46.) Defendants argue that Plaintiff's claim is not supported by evidence raising a genuine issue of material fact. (Dkt. No. 41–16 at 14–18.) Defendants are correct.

As discussed above, to prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). As discussed above, Plaintiff suffered from a serious medical need. The issue, then, is whether Defendants were deliberately indifferent to that need.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Here, the two-and-a-half month lapse of time between Plaintiff's fall and the examination by Dr. Ferrari, the delays in Plaintiff's receipt of pain medication that had been ordered for him, the four-month lapse of time between the examination by Dr. Ferrari and the examination by Defendant Dr. Weissman, the four-month lapse of time between Plaintiff's report that the pain medication that he had received was not effective and Dr. Weissman's prescription of a stronger medication, and the apparent failure to ensure that Plaintiff attended his last remaining physical therapy session are somewhat troubling. However, as Defendants note, Plaintiff's claims are quite similar to those raised in *Crum v. Marini,* No. 06–CV–0513 (GLS/DRH), 2007 WL 3104750 (N.D.N.Y. Oct.22, 2007), in which Judge Sharpe granted summary judgment for the defendants on the prisoner's medical care claims [31].

**\*13** In *Crum,* a prisoner suffering from degenerative cervical spondylosis alleged that the medical care provided to him violated the Eighth Amendment. The prisoner complained, in particular, that the defendants denied his numerous requests for an MRI and that he was only provided care by non-physicians. Judge Sharpe granted the defendants' motion for summary judgment dismissing the prisoner's Eighth Amendment claim. He noted that:

> Crum's medical records indicate that he was evaluated by various medical personnel on numerous occasions ...; that he was prescribed medication for his pain, that he was given x-rays and MRIs; and that defendant Dr. Marini periodically reviewed his medical records. There is no evidence, beyond Crum's conclusory allegations, that Crum's medical needs were ignored. That Crum may have preferred a system under which he had full and unfettered access to Dr. Marini, as opposed to a system under which the first line of contract was with [a Health Services Administrator] or [a physician's assistant], is not enough to establish deliberate indifference.

*Crum,* 2007 WL 3104750, at * 4.

Here, Plaintiff was evaluated by medical personnel frequently, prescribed pain medication, and given x-rays. Dr. Ferrari and Dr. Weissman periodically examined him and reviewed his medical records. Thus, as in *Crum,* Plaintiff has not raised a genuine issue of material fact that Defendants were deliberately indifferent to his serious medical need. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment medical care claim.

### E. Discrimination

Plaintiff claims that another inmate told him that Dr. Weissman provided care more promptly to Jewish inmates than to non-Jewish inmates. (Dkt. No. 7 at ¶ 47.) Defendants argue that Plaintiff has not raised a triable issue of fact. (Dkt. No. 41–16 at 18–20.) Defendants are correct.

"To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). "He also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Id.*

Here, there is no evidence that Dr. Weismann treated any similarly situated individuals any differently than he treated Plaintiff. Plaintiff's complaint alleges that *if* what he was told by the other inmate is true, *then* Dr. Weissman would be guilty of discrimination. (Dkt. No. 7 at ¶ 47.) In his opposition to the motion for summary judgment, Plaintiff states that he was denied discovery of the other inmate's medical records but that "[d]ates of requests for doctor visit of this inmate compared with dates of actual visits would show that the Jewish inmate ... was seen by Dr. Weissman within two weeks of the request whereas Plaintiff had to wait a minimum of four months." (Dkt. No. 43–4, Plaintiff's Response to Declaration of Dr. Weissman at ¶ 10.) Even if Plaintiff had been granted the discovery he sought and there were evidence before the Court establishing that the other inmate was seen more promptly than Plaintiff, there is no evidence that the other inmate was similarly situated to Plaintiff. The other inmate's medical condition, for instance, may have been more serious or time-sensitive than Plaintiff's. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's equal protection claim against Dr. Weissman.

#### F. Personal Involvement

**\*14** Plaintiff's claims against Defendants Fischer and Donelli are, essentially, that he was dissatisfied with their responses to his grievances. (Dkt. No. 7 at ¶¶ 22, 35–36, Ex. E.) Defendants argue that Plaintiff has failed to adequately allege that Defendants Fischer and Donelli were personally involved in any constitutional violation. (Dkt. No. 41–16 at 3–6.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [32] Here, as discussed above, there was no constitutional violation. Therefore, Defendants Fischer and Donelli were not personally involved in any violation and are not liable. Accordingly, I recommend that the Court grant Defendants' motion for summary judgment and dismiss all claims against Defendants Fischer and Donelli.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk serve copies of *Mendoza v. McGinnis,* No. 05–CV–1124 (TJM/DEP), 2008 **WL** 4239760, at \*10 & n. 16 (N.D.N.Y. Sept.11, 2008), *Harris v. Morton,* No. 9:05–CV–1049 (LEK/RFT), 2008 **WL** 596891, at \*3 (N.D.N.Y. Feb.29, 2008), and *Crum v. Marini,* No. 06–CV–0513 (GLS/DRH), 2007 **WL** 3104750 (N.D.N.Y. Oct.22, 2007) on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

#### Footnotes

1   The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

2   Atkinson was transferred from Downstate Correctional Facility to Bare Hill Correctional Facility in October 2005. (*See* Am. Compl. at ¶¶ 8, 10, Dkt. No. 7.) Atkinson has conceded that his transfer paperwork made no mention of him needing a bottom bunk. (*See* Objections at ¶ 4(a), Dkt. No. 45.)

3    CORC's records, as submitted by Atkinson, indicate that Atkinson, despite having no medical need for one, received a bottom bunk no later than December 12, 2006, less than one year after his January 16, 2006 injury. (*See* Am. Compl. at 28, Dkt. No. 7.) This was also less than two years from his October 2005 transfer to Bare Hill. (*See id.* at ¶ 10.)

4    The only discrepancy is one of computation. In his objections, Atkinson identifies a portion of the R & R which states that Dr. Weismann recommended physical therapy for Atkinson on January 31, 2007. The record indicates that this date is correct, and Atkinson does not appear to challenge its accuracy. Instead, after identifying this date in his objections, Atkinson states, *"Two years* after injury." (*See* Objections at ¶ 4(f), Dkt. No. 45 (emphasis in original).) Because Atkinson suffered his injury on January 16, 2006, a year and fifteen days prior to Dr. Weismann's recommendation, the two-year claim is erroneous and appears to be little more than an error in computation.

5    In his objections, Atkinson states that defendants Fischer and Donelli are personally involved because they were informed of the delays in Atkinson's medical treatment, yet did nothing to remedy it. (Objections at ¶ 4(l), Dkt. No. 45.) As noted above, however, there is no evidence that either defendant personally knew of or was involved with the delays Atkinson experienced.

1    Defendants' motion for summary judgment is supported by prison records, including grievance records and medical records. Motions for summary judgment must be supported by admissible evidence. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Hearsay evidence is not admissible unless it falls within an exception to the hearsay rule. Fed.R.Evid. 802. Medical and prison grievance records, although hearsay, may be admissible under the business records exception to the hearsay rule. That exception renders admissible records of "acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge" but only if such records are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Facts supporting admissibility must be supplied "by the testimony of the custodian or other qualified witness or by certification" that complies with Federal Rule of Evidence 902. Fed.R.Evid. 803(6). Here, none of the records are supported by any affidavit and have not been certified. Therefore, the records are not technically admissible. *See Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980). I have considered them, however, because Plaintiff relied on many of the same records in his complaint and in his opposition to the motion for summary judgment. I caution defense counsel that medical and grievance records should, in the future, be properly authenticated and accompanied by an affidavit or certification that complies with Rule 803.

2    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

3    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

4    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

5    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

6    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

7    *Ross v. McGinnis,* 00–CV–0275, 2004 **WL** 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

8    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

9    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

10   The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

11  *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

12  *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion—one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at a legal sufficiency of the claims).

13  *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

14  *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

15  *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

16  *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

17  *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

18  "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in

plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

19   *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

20   *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

21   *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

22   *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process—was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing—were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cab Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

23   *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

24   *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

25   *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 41 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

26   *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

27   *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05–CV–0501, 2007 **WL** 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

28   The undersigned will provide a copy of these unpublished decisions to Plaintiff in light of the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

29   *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

30   *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

31   The undersigned will provide a copy of this unpublished decision to Plaintiff in light of the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

32   *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

End of Document                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3104750
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph A. CRUM, Plaintiff,

v.

Dr. Dawn MARINI, Clinical Director; Bradley
R. Cink, Physician Assistant; Miller, Health
Service Administrator; T.R. Craig, Warden;
Scott Dodrill, Regional Director; Henry J.
Sadowski, Regional Counsel, Defendants.

No. 06-CV-0513 (GLS/DRH).    |    Oct. 22, 2007.

**Attorneys and Law Firms**

Joseph A. Crum, Forrest City, AZ, pro se.

Hon. Glenn T. Suddaby, United States Attorney for the
Northern District of New York, James T. Foley U.S.
Courthouse, Barbara D. Cottrell, Assistant United States
Attorney, of Counsel, Albany, NY, for the DefendantS.

Joseph A. Crum, Salters, SC, pro se.

*MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

## I. *Introduction*

**\*1** Plaintiff Joseph Crum brings this action under *Bivens
v. Six Unknown Named Agents of the Federal Bureau of
Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
(1971), alleging that defendants violated his constitutional
rights under the Fifth and Eighth Amendments when they
exhibited deliberate indifference to his serious medical needs.
*See Complaint; Dkt. No. 1.* Construing Crum's complaint
liberally, Crum also alleges a cause of action under the
Federal Tort Claims Act ("FTCA"). Crum's complaint was
referred to Magistrate Judge David R. Homer pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Northern
District of New York. Upon the motion of the defendants,
Judge Homer issued a Report-Recommendation and Order

recommending that summary judgment be granted in favor of
the defendants as to all claims in the complaint. *See Report-
Recommendation and Order; Dkt. No. 23.* [1] Now pending
before the court is Crum's timely objection to the Report-
Recommendation. *See Dkt. 26.*

Upon careful consideration of the arguments, the relevant
parts of the record, and the applicable law, the court
agrees that summary judgment in favor of the defendants is
appropriate on Crum's *Bivens* claim, though for reasons that
differ slightly from those given by Judge Homer. With respect
to Crum's FTCA claim, the court finds that the defendants did
not move to dismiss this claim. Hence, the court holds that
dismissal of the FTCA claim is inappropriate at this time.

## II. *Standard of Review*

Before entering final judgment, this court routinely reviews
all report-recommendations in cases it has referred to a
Magistrate Judge. If a party has objected to specific elements
of the Magistrate Judge's findings and recommendations, this
court reviews those findings and recommendations *de novo*.
*See Almonte v. N.Y. State Div. of Parole,* No. 9:04-CV-484,
2006 **WL** 149049, *\*6-7 (N.D.N.Y. Jan.18, 2006).* Even in
those cases where no party has filed an objection, or only a
vague or general objection has been filed, this court reviews
the findings and recommendations of a Magistrate Judge
under a clearly erroneous standard. *Id.*

In this case, Crum has specifically objected to nearly
all aspects of Judge Homer's Report-Recommendation. In
particular, Crum objects to Judge Homer's determinations that
Crum did not suffer from a serious medical condition, that
the defendants did not exhibit deliberate indifference towards
Crum's medical needs, and that the defendants were entitled to
qualified immunity. [2] In light of Crum's specific objections,
the court has reviewed these determinations *de novo*. Crum
has not objected to Judge Homer's conclusion that Crum's
Fifth Amendment Due Process claim should be dismissed;
thus, the court has reviewed this determination for clear error.

## III. *Discussion*

### A. *Discovery*

Preliminarily, the court must address Crum's contention, raised for the first time in his objections to the Report-Recommendation, that he should have been permitted to take discovery prior to the issuance of Judge Homer's Report-Recommendation. The court finds that Crum has waived any purported right to discovery by not raising the issue until this late stage of the proceedings. The Second Circuit has held that "a party's failure to seek discovery under Rule 56(f) *before responding* to a summary judgment motion is 'itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *N.Y.S. Teamsters Conf. Pension and Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648 (2d Cir.2005) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 n. 1 (2d Cir.2004)) (emphasis added).

**B.** *FTCA Claim*
 **\*2** Construed liberally, Crum's complaint can be read as asserting a claim under the FTCA. *See Complaint, p. 17; Dkt. 1* (seeking damages for "my Tort claim and *Bivens* claim"). [3] The defendants have not explicitly moved to dismiss Crum's FTCA claim. Rather, in their moving papers, the defendants note that Crum "has clearly filed this action as a Bivens complaint," and that Crum's "allegations of deliberate indifference are civil rights allegations and do not fall within the realm of the Federal Tort Claims Act." *See Mem. of Law in Supp. of Defs.' Mot. for Summ. J., p. 6 n. 5; Dkt. 18.* Although it may be the case that the facts alleged by Crum do not give rise to a claim under the FTCA, the court does not construe this brief mention of the FTCA claim as constituting a motion to dismiss that claim. Thus, to the extent that Judge Homer's Report-Recommendation can be read as recommending dismissal of Crum's FTCA claim, the court rejects this recommendation. Accordingly, the FTCA claim survives. Should the defendants wish to move to dismiss this claim, they must direct their motion to Judge Homer within thirty days of the date of this order.

**C.** *Due Process Claim*
Judge Homer properly concluded that any claim based on an alleged violation of the Fifth Amendment's Due Process Clause should be dismissed. The court has found no case indicating that a denial of proper medical care to a convicted inmate raises a colorable Due Process claim. Rather, the cases indicate that the Due Process Clause protects the rights of pretrial detainees, while the Eighth Amendment protects the

rights of convicted inmates. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Accordingly, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of Crum's Due Process claim.

**D.** *Eighth Amendment Claim*
Crum objects to Judge Homer's Report-Recommendation insofar as it concludes that Crum's injuries did not amount to a serious medical need, and that, even if the injuries were serious, the defendants did not exhibit deliberate indifference to Crum's medical needs. The court concludes that it would be premature to hold, at the summary judgment stage, that the injuries complained of by Crum were not serious. However, the court agrees with Judge Homer that Crum's conclusory allegations regarding the denial of appropriate medical treatment fail to raise a genuine issue of material fact as to defendants' deliberate indifference.

*1. The Existence of a Serious Medical Need*
The Second Circuit has held that "[i]n order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Although there is no simple test for determining what constitutes a "serious" medical need, "[t]he standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance,* 143 F.3d at 702 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)). In making the determination as to seriousness, courts have considered the following factors: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (citations omitted).

 **\*3** In this case, Crum has alleged that the injuries to his lower back, shoulder, cervical spine, neck, and head caused pain that was "excruciating" and "agonizing," and inhibited him, at times, in the performance of daily activities such as sitting, standing, lying down, and picking up objects. *See Complaint, p. 6, 7, 10; Dkt. 1.* Judge Homer found these "conclusory allegations" and "subjective complaints" to be

insufficient to establish a serious medical need. *See Report-Recommendation, p. 6; Dkt. 23*. The court cannot agree.

There are undoubtedly injuries of such a trivial nature that complaints of excruciating pain emanating therefrom are simply not credible, and it is well settled that an inmate complaining of an Eighth Amendment violation must demonstrate that his medical condition is objectively a serious one. *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003). However, where there is some evidence that the severe pain the inmate complains of may be real, it is not appropriate to dismiss such complaints on the grounds that they are "subjective." Here, there is ample evidence from which a trier of fact could conclude that Crum's allegations of excruciating and debilitating pain were true. For instance, Crum's medical records reveal that as of the date of his transfer out of FCI Raybrook, on or about August 5, 2005, Crum was taking the prescription drug Naproxen to treat "degenerative cervical spondylosis." *See Crum's Medical Records ("Medical Records"), p. 35-36, attached as Ex. 2 to Defs.' Mot. for Summ. J.; Dkt. 18.* Additionally, an MRI of Crum's cervical spine conducted on May 24, 2005, indicated that, among other problems, "[e]xtensive disc degeneration is apparent." *Id.* at 95. This evidence, combined with the allegations in Crum's complaint, could be construed to suggest both that Crum suffered from "chronic and substantial pain," and that a reasonable doctor found his injury "worthy of comment or treatment." *Chance,* 143 F.3d at 702. Although a trier of fact might well conclude that Crum's injury was not "serious," the court cannot conclude as a matter of law that it was not.

*2. Deliberate Indifference*
To establish "deliberate indifference," a prisoner must show that a particular defendant "knows of and disregards an excessive risk to inmate health or safety." *Brock,* 315 F.3d at 164 (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The prisoner must prove that the defendant had "actual knowledge" of the risk; however, "evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Id.*

Crum's allegations of "deliberate indifference" are almost wholly conclusory in nature, making it difficult to determine the precise nature of the behavior of which he complains.

A generous reading of the complaint suggests that Crum believes that the defendants exhibited deliberate indifference to his medical needs when: (1) defendants Marini, Cink, and Miller denied Crum's "numerous requests" for an MRI; [4] (2) defendants Miller and Cink denied Crum's requests to see a doctor; and (3) defendant Cink injected steroids into Crum's shoulder "causing severe pain and suffering." Judge Homer correctly concluded that these allegations fail to raise a genuine issue of material fact as to defendants' deliberate indifference.

*4 First, the evidence flatly contradicts Crum's contention that the defendants denied his "numerous requests" for an MRI. In fact, Crum received an MRI of the brain and an MRI of the cervical spine on May 24, 2005, and an MRI of the head on July 8, 2005. *See Medical Records, p. 92-95; Dkt. 18.* Additionally, Crum received an x-ray of his right shoulder on September 29, 2003, and an x-ray of the cervical spine on March 22, 2005. *Id.* at 40-41. Moreover, to the extent that Crum alleges that he should have received additional MRIs, such an allegation fails to state an actionable claim of deliberate indifference. Indeed, in *Estelle v. Gamble,* the seminal case regarding Eighth Amendment violations arising out of prison officials' deliberate indifference to serious medical needs, the Supreme Court noted that "the question whether an x-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In short, "[a] medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *Id.*

Second, even if it is true, as Crum alleges, that he was only provided care by defendants Miller (the Health Services Administrator) and Cink (a physician's assistant), this does not constitute deliberate indifference to Crum's serious medical needs. Crum's medical records indicate that he was evaluated by various medical personnel on numerous occasions during his time at FCI Raybrook; that he was prescribed medication for his pain; that he was given x-rays and MRIs; and that defendant Dr. Marini periodically reviewed his medical records. There is no evidence, beyond Crum's conclusory allegations, that Crum's medical needs were ignored. That Crum may have preferred a system under which he had full and unfettered access to Dr. Marini, as opposed to a system under which the first line of contact

was with Miller or Cink, is not enough to establish deliberate indifference. As the Second Circuit has explained, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703.

The same rationale applies to Crum's contention that the steroid injection given to him by defendant Cink constituted deliberate indifference to his medical needs. Indeed, the fact that Cink attempted to alleviate his shoulder pain tends to contradict any suggestion that Cink was indifferent to Crum's medical needs. That the treatment did not have the desired effect is not evidence of deliberate indifference.

Finally, even assuming that the medical care and treatment provided to Crum was in some manner deficient, Crum has presented no evidence, beyond conclusory allegations, that the defendants acted with the requisite state of mind to state a claim for deliberate indifference. Deliberate indifference is "a mental state equivalent to subjective recklessness," and requires that the defendant "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006). Here, the medical personnel tending to Crum did not withhold treatment in the face of a substantial risk that harm would result. To the contrary, Crum's medical records indicate that Dr. Marini ordered an MRI of Crum's cervical spine in spite of her doubts as to its necessity. *See Medical Records, p. 40* (noting that "all xrays have shown degenerative joint disease which is associated with old injuries, with *no acute* findings," but going on to say "however, will order a MRI of cervical spine and MRI brain as a routine consult to be done when the imaging vehicle returns to FCI Raybrook.") (emphasis in original).

**\*5** Thus, in summary, the court is in agreement with Judge Homer that the defendants did not act with deliberate indifference to Crum's serious medical needs. Accordingly, the court adopts Judge Homer's Report-Recommendation to the extent that it holds that defendants did not act with deliberate indifference, and rejects it to the extent that it holds that Crum's injuries did not constitute a serious medical need.

**E.** *Qualified Immunity*

Crum objects to Judge Homer's conclusion that the defendants are entitled to qualified immunity. Upon *de novo* review, the court finds that Judge Homer correctly determined that the defendants are entitled to qualified immunity. The affirmative defense of qualified immunity shields prison officials from liability "for their discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (citations and quotations omitted). As discussed above, the defendants have not violated Crum's constitutional rights. Accordingly, the court adopts Judge Homer's Report-Recommendation to the extent that it holds that the defendants are entitled to qualified immunity with respect to Crum's Eighth Amendment claims.

**IV.** *Conclusion*

Having considered Crum's objections and reviewed Judge Homer's findings of fact and conclusions of law, the court rejects Judge Homer's Report-Recommendation to the extent that it holds that Crum's injuries were not a serious medical need for purposes of the Eighth Amendment, and rejects the Report-Recommendation to the extent that it dismisses Crum's FTCA claim. The court adopts Judge Homer's Report-Recommendation in all other respects.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Homer's August 7, 2007 Report-Recommendation and Order (*Dkt. No. 23* ) is accepted and adopted in part, and rejected in part, and Crum's Fifth and Eighth Amendment claims are dismissed; and it is further

**ORDERED** that should the defendants wish to move to dismiss Crum's FTCA claim, they must direct their motion to Judge Homer within thirty (30) days of the date of this Order; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties.

**IT IS SO ORDERED.**

Footnotes

1    The Clerk is directed to append Judge Homer's Report-Recommendation to this decision, and familiarity is presumed.
     *See Dkt. No. 23.*

2    Crum has also objected to the Report-Recommendation "to the extent that it purport [sic] to contend that plaintiff failed
     to exhaust his available administrative remedies." *See Pl.'s Objections to the Report-Recommendation and Order, p. 4;*
     *Dkt. 26.* However, the Report-Recommendation explicitly declined to address the defendants' contention that Crum failed
     to exhaust his administrative remedies. *See Report-Recommendation, p. 7 n. 4; Dkt. 23.* The court agrees with Judge
     Homer that, because Crum's constitutional claims should be dismissed on other grounds, it is unnecessary to reach the
     issue of exhaustion of remedies. Additionally, the court agrees with Judge Homer that it is unnecessary to address the
     defendants' arguments that (1) Crum failed to demonstrate the personal involvement of defendants Marini, Craig, Dodrill,
     and Sadowski, and (2) defendant Miller is entitled to absolute immunity.

3    Crum filed his complaint in this action on April 17, 2006, approximately two weeks after being informed that his
     Administrative Tort Claim had been denied by the Federal Bureau of Prisons. *See Report of Administrative Tort Claim*
     *Investigation, attached as Ex. J to the Decl. of Patrick Ward in Supp. of Defs.' Mot. for Summ. J. ("Ward Decl."); Dkt. 18.*

4    The supposed denial of his requests for an MRI appears to be Crum's chief complaint. He specifically requested an MRI
     at all three levels of the administrative review process. *See Exs. G, H, and I to the Ward Decl.; Dkt. 18.*

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4104455
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David WHITCOMB, Plaintiff,

v.

Reuel A. TODD, Sheriff of Oswego County; Richard
Thompson, MD, Medical Administrator of Oswego
County Jail Health Program; Dr. Gregorie, [1]
Medical Director, Five Points Correctional Facility;
Cynthia Delaney, Oswego County Jail; and Julie
Demm, Nurse, Oswego County Jail, Defendants.

No. 9:04-CV-223 (LEK/DRH). | Sept. 3, 2008.

**Attorneys and Law Firms**

David Whitcomb, Rome, New York, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Charles E.
Symons, Esq, of Counsel, East Syracuse, NY, for Defendants
Todd, Delaney, & Demm.

Martin Ganotis Brown Mould & Currie, P.C., Brian M.
Gargano, Esq., Mark L. Dunn, Esq., of Counsel, Dewitt, NY,
for Defendant Thompson.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Senta B. Siuda, Esq., Assistant Attorney General,
of Counsel, Syracuse, NY, for Defendant Gregoire.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-
Recommendation filed on August 5, 2008, by the Honorable
David R. Homer, United States Magistrate Judge, pursuant
to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District
of New York. Report-Rec. (Dkt. No. 73).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report-Recommendation, the party "may serve and file

specific, written objections to the proposed findings and
recommendations," FED. R. CIV. P. 72(b), in compliance
with L.R. 72.1. No objections have been raised in the allotted
time with respect to Judge Homer's Report-Recommendation.
Furthermore, after examining the record, the Court has
determined that the Report-Recommendation is not subject to
attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 73)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that Defendants' Motions for Summary
Judgment (Dkt.Nos.66-68) are **GRANTED** in all respects;
and it is further

**ORDERED,** that Plaintiff's Amended Complaint (Dkt. No.
36) is **DISMISSED with prejudice** against all Defendants;
and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION AND ORDER** [2]

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se David Whitcomb ("Whitcomb"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action pursuant
to 42 U.S.C. § 1983 alleging that five defendants consisting
of a county sheriff, the medical administrator and two nurses
at a county hospital, and a DOCS physician violated his
constitutional rights under the First, Fifth, Eighth, Thirteenth,
and Fourteenth Amendments. Am. Compl. (Docket No.
36). Additionally, Whitcomb asserts this action pursuant to
42 U.S.C. §§ 1981, 1985, and 1986 and Title II of the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101
et seq. Presently pending are motions for summary judgment
by (1) defendants Todd, Delaney, and Demm ("County
defendants"), (2) defendant Thompson ("Thompson"), and

(3) defendant Gregoire ("Gregoire") pursuant to Fed.R.Civ.P. 56. Docket Nos. 66-68. [3] Whitcomb opposes the motion. Docket No. 70. For the following reasons, it is recommended that all defendants' motions be granted.

## I. Background

The facts are related herein in the light most favorable to Whitcomb as the nonmoving party. *See* subsection II(A) *infra*. Because the issues presented by defendants' motions require consideration of the numerous instances of Whitcomb's medical treatment, the evidence concerning that treatment is described herein in detail.

Whitcomb was involved in a motor vehicle accident in 1983 in which his spine was severed and left him a paraplegic. Whitcomb Dep. (Docket No. 66, pt. 4) at 8. Whitcomb has since been confined to a wheelchair. *Id.* In January 2002, Whitcomb underwent an operation on his left leg at the Syracuse Veterans Administration ("VA") Hospital. Am. Compl. at 5; Thompson Aff. (Docket No. 68, pt. 14) ¶ 6. Following the operation, Whitcomb developed an infection at the wound site on his left thigh. Am. Compl. at 5; Thompson Aff. ¶ 6. In February 2002, Whitcomb was hospitalized for approximately one week to receive treatment for his infection. Whitcomb Dep. at 19. Upon his discharge on February 13, 2002, Whitcomb performed his own wound dressing changes and "was quite reliable," could administer antibiotics through his peripherally inserted central catheter (PICC) line, and could return home with a prescription for Percocet and an abundance of clean bandage dressings. Am. Compl. at 31. For the next three months, Whitcomb returned to the VA for follow-up examinations. *Id.* at 32, 36. The wound was healing. *Id.*

### A. Oswego County Correctional Facility

**\*2** On June 8, 2002, Whitcomb was arrested. Am. Compl. at 5. Upon arrival at the Oswego County Correctional Facility ("OCCF"), Whitcomb was seen by a facility nurse who recorded his patient history, including his pain medication and instructions on how properly to clean and bandage his post-operative wound. Thompson Aff. ¶¶ 7, 9-10; Docket No. 68, pt. 15 at 2-3; Whitcomb Depo. at 25. On June 10,

2002, Whitcomb was examined by Thompson, who noted that the leg showed no signs of acute infection, Whitcomb did not complain, and Whitcomb also had a dime-sized pressure sore on his coccyx which did not exhibit any signs of acute infection. Thompson Aff. ¶ 8; Docket No. 68, pt. 15 at 4-5. Thompson ordered daily dressing changes for his wound and to clean and disinfect his pressure sore. Thompson Aff. ¶ 8; Docket No. 68, pt. 15 at 4-5.

The following day, Thompson examined Whitcomb again, finding no acute signs of infection, hearing no complaints of pain, and learning that Whitcomb had chronic back problems which Thompson determined did not require narcotics for relief. Thompson Aff. ¶ 12. Whitcomb's wounds were cleansed, the bandages changed, he was given a wash basin for his sink and wash cloths and towels, and he was advised to clean himself. Docket No. 68, pt. 15 at 5.

On June 12, 2002, Whitcomb's dressings were applied, his pressure sore cleansed, and the nursing staff ordered disposable pads and a 3-in-1 shower and bathroom chair. Docket No. 68, pt. 15 at 6. On this date, Whitcomb also completed an inmate request/complaint form requesting equipment, such as a shower bench, toilet seat, wheel chair, and better mattress, to prevent bedsores. Am. Compl. at 30. In addition to ordering the 3-in-1 chair, OCCF also obtained a wheel chair that was delivered on June 18, and attempted to acquire an alternate chair which was located at the Pulaski VA. *Id.* The wheel chair was delivered but the alternate chair never arrived, the 3-in-1 bathroom chair that OCCF provided was not adequate for Whitcomb, and waited a month to receive his own shower bench. Whitcomb Depo. at 35-37.

From June 13 until June 21, Whitcomb's dressings were changed daily with no signs of infection and serous drainage [4] only from the wound. Docket No. 68, pt. 15 6-7. However, on June 21, 2002, Whitcomb completed another inmate request/complaint form stating that the medical department was wrongly prohibiting him from using his own shower bench and the toilet seat was inadequate because it removed the skin from his buttocks because it was not padded. Am. Compl. at 29. In response, OCCF allowed Whitcomb to bring his own shower bench into the facility even though a chair had already been provided. *Id.*

From June 22 until July 5, Whitcomb continued to undergo multiple daily wound dressings with only serous fluid noticed as discharge. Docket No. 68, pt. 15 at 9-12. Additionally, on June 24, 2002, Whitcomb was ordered a special foam mattress which was delivered five days later. *Id.* at 9, 10. Whitcomb was also examined by Thomson who noted no signs of acute infection and no deep cavity despite the wound's apparent inability to heal. Thomson Aff. ¶ 13; Docket No. 68, pt. 15 at 10. The pressure sores were healing and showed no signs of infection. Thomson Aff. ¶ 13; Docket No. 68, pt. 15 at 10. While Whitcomb generally had no complaints of pain, on June 30 he notified nursing staff of his discomfort and they provided him with a non-narcotic medication which appeared to relieve his pain. Thompson Aff. ¶ 14.

**\*3** On July 2, 2002, Whitcomb had a verbal exchange with a nurse at OCCF. Docket No. 68, pt. 15 at 11, 12. Whitcomb filed an inmate request/complaint form stating that he attempted to cooperate with medical staff but his needs were not being met. Due to the care and equipment provided, he developed new pressure ulcers, he required an operation on his left hip, OCCF's current bandaging technique was worsening his condition, and he had not received the proper pain medication to alleviate his discomfort. Am. Compl. at 27.

For the next month, Whitcomb continued to have his wound redressed multiple times per day and his pressure sores cleansed and disinfected, repeatedly with neither exhibiting signs or symptoms of infection. Docket No. 68, pt. 15 at 13-16. On July 9, 2002, Thompson reprobed Whitcomb's leg wound and found it deep but exhibiting no signs of infection. Thompson Aff. ¶ 15; Docket No. 68, pt. 15 at 13. Thompson recommended that Whitcomb receive an x-ray because he hypothesized that Whitcomb was suffering from osteomyelitis, a condition where "bone tissue dies as a result of the lost blood supply for which primary treatment is surgical removal of the infected bone and tissue ... deemed acute when a patient exhibits signs of extreme pain, chills, malaise and high fever." Thompson Aff. ¶ 15. Thompson again noted that Whitcomb had not demonstrated the signs of acute osteomyelitis. *Id.* He also noted that the pressure ulcer was healing and that Whitcomb voiced no complaints. *Id.*

On July 9 and 10, Whitcomb refused his pain medication and it was discontinued at his request. Docket No. 68, pt. 15 at 13-14. Additionally, an x-ray was negative. Thompson Aff. ¶ 16; Docket No. 68, pt. 16 at 48, 49. On July 13, Whitcomb

complained to nursing staff that he needed immediate surgery and should be taken to the hospital. Docket No. 68, pt. 15 at 14. Three days later, Whitcomb complained of feeling depressed. *Id.* On July 25, Whitcomb complained of a fever. Thompson Aff. ¶ 18, Docket No. 68, pt. 15 at 15-16. Whitcomb's temperature was taken and was normal, there were no signs of infection, and a culture of his leg wound was taken and sent out for analysis. Thompson Aff. ¶ 18, Docket No. 68, pt. 15 at 15-16. On July 29, Thompson obtained the results from the culture, which revealed a staph infection. Thompson Aff. ¶ 18; Docket No. 68, pt 15 at 16. Whitcomb was placed on antibiotics. Thompson Aff. ¶ 18; Docket No. 68, pt 15 at 16.

From August 1 to August 15 Whitcomb was seen multiple times per day, had daily dressing changes performed and medications administered, and continued to "exhibit[ ] no complaints or findings which would have been indicative of an acute as opposed to a chronic condition." Thompson Aff. ¶ 20. However, upon changing Whitcomb's bandages, a yellow, green, or bloody discharge began appearing in moderate to large amounts. Docket No. 68, pt. 15 at 16, 17,19, 20. On August 5, 2002, Whitcomb again complained of a fever. Thompson Aff. ¶ 19. Whitcomb's temperature was again normal, but his leg wound had "pus and fluid build up," prompting Thompson to seek an orthopaedic consult from the Syracuse VA. *Id.*

**\*4** Whitcomb was scheduled to go to the VA on August 9, but OCCF's medical facility was recontacted by the VA, which explained that it did not evaluate incarcerated patients and cancelled Whitcomb's appointment. *Id.;* Docket No. 68, pt. 15 at 18-19. The VA was called twice for a referral. Thompson Aff. ¶ 19; Docket No. 68, pt. 15 at 18-19. On August 7, Thompson contacted University Hospital ("University") in Syracuse and scheduled an appointment for Whitcomb for August 16. Thompson Aff. ¶ 19.

On August 16, 2002, Whitcomb was sent to University and admitted for "suspected osteopyelitis of the left femur," and a tissue culture positive for methicillin-resistant Staphylococcus aureus ("MRSA"). [5] Whitcomb reported that his thigh had been draining for approximately one month, the drainage was "foul smelling and brownish green in color, as well as having a bloody tinge," and he had abdominal pain. Docket No. 68, pt. 16 at 29; Am. Compl. at 33. Whitcomb had

a fever and chills and upon initial examination had "500 ccs of brownish green fluid ... expressed from [his left thigh]." Docket No. 68, pt. 16 at 29; Am. Compl. at 33. Whitcomb underwent a surgical irrigation and debridement procedure, was placed on antibiotics, prescribed Percocet as needed for pain, and discharged to OCCF on August 26 with orders to continue the antibiotics for six weeks. Thomas Aff. ¶ 21; Docket No. 68, pt. 16 at 30-31; Am. Compl. at 34-35. Additionally, while at University, Whitcomb underwent a CT scan of his abdomen which revealed "degenerative changes of the thoracic and lumbar spine." Docket No. 68, pt. 16 at 27; Am. Compl. at 25-26.

Upon return to OCCF, Whitcomb was placed in isolation due to his MRSA infection. Thompson Aff. ¶ 22. OCCF medical staff continued the orders previously written by University for daily dressings and intravenous (IV) antibiotics. *Id.* On August 27, Whitcomb complained of back pain and received extra-strength Tylenol. Docket No. 68, pt. 15 at 22. Two days later, a blood clot formed in Whitcomb's PICC line and he was sent to the emergency room at University to dissipate the clot and flush the line. Thompson Aff. ¶ 23.

After his return to OCCF, Whitcomb's wound secreted moderate to large amounts of drainage; however, during Whitcomb's follow-up appointment with University on September 6 the wound was granulating, there was no active drainage, and there was no change to the medication orders. Docket No. 68, pt. 15 23-25; Docket No. 68, pt. 16 at 32; Thompson Aff. ¶ 24. From September 6 until 27, Whitcomb's dressings were changed multiple times daily and showed varying amounts of drainage and blood approximately six times. Docket No. 68, pt. 15 at 25-32. There were no signs or symptoms of infection at the PICC line site, the pressure ulcers were healing, and the wound appeared improved. *Id.* Additionally, the medical records only show three instances of Whitcomb complaining of pain and general malaise and only one complaint specifically identifying back pain as the root cause. Thompson Aff. ¶ 25; Docket No. 68, pt. 15 at 28-29.

 **\*5** On September 27, 2002, Whitcomb was examined at the orthopaedic clinic at University where it was noted that his wound was healing and he was ordered to continue with antibiotics through his PICC line. Thompson Aff. ¶ 27; Docket No. 68, pt. 16 at 33; Docket No. 68, pt. 15 at 33. A few days later, upon examination by Thompson, Whitcomb's

PICC line appeared dirty with redness around the insertion site. Thompson Aff. ¶ 28. The PICC line was removed, the area sterilized, and a new PICC line inserted. *Id.* For the next few days the PICC line showed no signs or symptoms of being infected, but the leg wound was excreting large amounts of yellowish drainage that was often blood-tinged. Docket No. 68, pt. 15 at 35-37.

On October 4, 2002, Thompson noticed bloody, yellow drainage from the leg wound and redness around the PICC line insertion site. Thompson ¶ 29; Docket No. 68, pt. 15 at 37. Thompson ordered an infectious disease consult with Dr. Anviler, who recommended the PICC line be removed and antibiotics administered orally, a bone scan, and an MRI. Thompson ¶ 29; Docket No. 68, pt. 15 at 37. These recommendations were followed. Thompson ¶ 30; Docket No. 68, pt. 15 at 38. At no time from September 27 to October 4 were there any recorded instances of complaints of back pain from Whitcomb. Docket No. 68, pt. 15 at 33-38.

From October 4 to 11, Whitcomb's wound was dressed multiple times per day and was generally secreting large amounts of a bloody discharge. Docket No. 68, pt. 15 at 38-41. However, the PICC line site healed without further issue. *Id.* On October 11, 2002, Whitcomb was sent for a bone scan and MRI. Docket No. 68, pt. 16 at 50-52, 63-64. The MRI "revealed some inflammation of the left hip but [detected] no isolated fluid collection ... and the left hip was unremarkable for septic arthritis or infection" while the bone scan revealed possible chronic osteomyelitis with approximately 2 x 2.5 cm of pooled fluid and puss. *Id.*

For the following week, Whitcomb continued to have his dressings changed with continual reports of bloody and yellow drainage from his leg. Docket No. 68, pt. 15 at 41-42. However, there were no documented complaints of pain. *Id.* On October 18, 2002, Whitcomb was sent to University with his diagnostic test results and possible surgery was discussed. Thompson ¶ 32; Docket No. 68, pt. 16 at 35. The remainder of the month, Whitcomb was examined several times by nursing staff, his dressings changed multiple times per day, there were still "no complaints and findings which would have been indicative of an acute condition," though his bandages were generally yielding bloody discharge, and there were no notable changes or complaints concerning his condition. Thompson Aff. ¶ 33; Docket No. 68, pt. 15 at 44-47.

**Federico, Anna 4/22/2015**
**For Educational Use Only**

On November 1, 2002, Whitcomb had another follow-up examination at University where no changes in conditions or complaints were noted, it was recommended that the initial orders continue, and another consult with infectious diseases was scheduled for November 19. Thompson Aff. ¶ 34; Docket No. 68, pt. 15 at 47. For the next three weeks, medical records reflect approximately fifteen entries of moderate to large amounts of bloody, purulent discharge discovered upon changing Whitcomb's leg wound dressing. Docket No. 68, pt. 15 at 50-54. The remaining health records generally indicated drainage of serous fluid tinged with varying amounts of blood. *Id.*

 *6 Additionally, on November 11, 2002, OCCF's medical staff attempted to schedule Whitcomb for an appointment with the infectious disease physician at University. Docket No. 68, pt. 15 at 51. However, the following day they were informed that the infectious disease clinic did not evaluate prisoners. Docket No. 68, pt. 15 at 52. This exchange persisted until Whitcomb was sent to University for a follow-up on November 19, when he was evaluated by Dr. Rose, an infectious disease specialist, who stated that Whitcomb "had a chronic condition for which antibiotic therapy was proving futile and that [Whitcomb's] condition required a surgical solution." Thompson ¶ 36. Despite Dr. Rose's recommendations, Whitcomb indicated that he was not interested in undergoing another surgery. *Id.*

Following Whitcomb's return to OCCF, the medical records indicate that for the remainder of November, there were twenty-eight entries describing large amounts of purulent discharge excreting from the leg wound, indicating that the wound site was inflamed and very red with slight signs of improvement as time progressed, and no complaints of back pain from Whitcomb. Docket No. 68, pt. 15 at 54-57. During December, there were approximately forty-three nursing entries of bandage changes yielding moderate to large amounts of bloody, purulent, odoriferous discharge with a very red and irritated wound site. Docket 68, pt. 15 at 58-59; Docket No. 68, pt. 16 at 2-5, 8-9. Additionally, during December, Whitcomb refused antibiotics on at least seven occasions. Docket No. 68, pt. 15 at 59; Docket No. 68, pt. 16 at 2-3, 4, 5, 8-9.

On December 17, 2002, Whitcomb returned to University for a follow-up appointment with Dr. Rose, but the appointment

was cancelled as Whitcomb refused to entertain any surgical possibilities and, given Whitcomb's refusals, there was nothing else that Dr. Rose could do for him. Thompson Aff. ¶¶ 39-40. On December 20 Thompson attempted to examine Whitcomb and explain the necessity of another surgical debridement for his wound, but Whitcomb continued to refuse. Thompson Aff. ¶ 41. Whitcomb made no complaints of pain. *Id.*

On December 21, 2002, Whitcomb was sent to University for further treatment and urged to undergo irrigation and debridement of his wound again, but he continued to refuse treatment. Thompson Aff. ¶ 42. Whitcomb also refused antibiotics. *Id.* Upon discharge, University directed that Whitcomb continue to receive antibiotics and dressing changes and noted that he was positive for transient fever, chills and night sweats, his symptoms were not exacerbated or worsened prior to his admission that day, he experienced generalized pain and sharp abdominal pain, and he was reluctant to receive antibiotics, undergo surgery, or have his leg amputated. Docket No. 68, pt. 16 at 41-42. For his pain, University provided him with a narcotic medication. Docket No. 68, pt. 16 at 43.

Whitcomb returned to OCCF on December 27 and continued to refuse antibiotics. Thompson Aff. ¶ 42. From December 30 to January 8, medical records reflect thirteen nursing entries of wound dressing changes indicating moderate to large amounts of serous fluid discharge occasionally tinged pink and good skin integrity and healing at the wound site. Docket 68, pt. 16 at 9-10. On January 14, 2003, Whitcomb filed another inmate request/complaint form alleging that Delaney had spread rumors around the jail that he was "a pig and don't [sic] shower," and accusations that Delaney helped delay the arrival of his personal shower bench for twenty-five days. Am. Compl. at 28. Additionally, Whitcomb stated that he was now sick as he was running a fever and was weak. *Id.*

 *7 From the beginning of January until Whitcomb's transfer to Five Points Correctional Facility ("Five Points") in April, there are approximately 126 entries in Whitcomb's health record describing the moderate to large amounts of purulent discharge which, after March 12 generally included blood in the discharge and on his bandages. Docket 68, pt. 16 at 10-24. Despite these significant health problems, there are a limited number of documented instances of complaints concerning Whitcomb's back pain. Docket 68, pt. 16 at 16. Additionally,

there were three mental health entries included in the record which reflect that Whitcomb was only a mild suicide risk as he was participating in productive counseling sessions. Docket No. 68, pt. 16 at 79-81.

### B. Five Points Correctional Facility

On April 3, 2003, Whitcomb was transferred to Five Points where he was under the exclusive care of Gregoire. Whitcomb Dep. at 96. Whitcomb saw Gregoire virtually every day. *Id.* at 97-100. His only claims against Gregoire concern the pain medication prescribed by Gregoire, *Id.*

On April 21, 2003, Whitcomb was admitted to the Five Points infirmary due to his thigh wound. Gregoire Aff. (Docket No. 66, pt. 5) ¶ 9. Upon examination, Whitcomb voiced no complaints of pain and was able to move from his bed to a wheelchair. *Id.* From April 22 until April 30, there were only two recorded complaints of lower back pain, for which Whitcomb requested and was provided Tylenol. *Id.* ¶¶ 10-20; Docket No. 66, pt. 5 at 14-17. On April 30, 2003, Whitcomb requested a prescription for Percocet and Gregoire wrote him a prescription for Neurontin as it "is often effective in patients with chronic pain...." Gregoire Aff. ¶ 21. [6] For the following five days, Whitcomb voiced no complaints concerning his back pain. Gregoire Aff. ¶¶ 22-27; Docket No. 66, pt. 5 at 18-19.

On May 7, 2003, Whitcomb requested Percocet again; it was suggested, and declined, that he take an antidepressant. Gregoire Aff. ¶ 28; Docket No. 66, pt. 5 at 19. Upon examination, Whitcomb was not experiencing any functional limitations due to his pain as he was moving from his wheelchair to his bed and back again easily and quickly. Gregoire Aff. ¶¶ 29-30; Docket No. 66, pt. 5 at 19-20.

From the evening of May 7 until May 12, Whitcomb had no documented complaints of pain. Gregoire Aff. ¶¶ 31-35; Docket No. 66, pt. 5 at 20-21. On May 12, Whitcomb requested something different for his pain as the Neurontin upset his stomach; however, it was again noted that Whitcomb was moving from his bed to his wheelchair with ease and in no apparent discomfort. Gregoire Aff. ¶ 36; Docket No. 66, pt. 5 at 21-22. Whitcomb accepted the

antidepressant. Gregoire Aff. ¶ 36; Docket No. 66, pt. 5 at 21-22.

On May 13, 2003, Whitcomb's leg cultures were positive for MRSA and he was medically discharged from the infirmary, although it appears he remained housed there until his eventual transfer to Walsh Regional Medical Unit on June 9, 2003. Gregoire Aff ¶¶ 37, 48; Docket No. 66, pt. 5 at 22. On May 18, Whitcomb complained of middle back pain and thought he had a kidney infection, but the test for an infection was negative. Gregoire Aff. ¶ 38; Docket No. 66, pt. 5 at 24. Whitcomb was offered ibuprofen and declined it. Gregoire Aff. ¶ 38; Docket No. 66, pt. 5 at 24.

**\*8** For the next three days, Whitcomb complained of back pain, accepting ibuprofen on May 20 and a regimen of extra-strength Tylenol on May 21. Gregoire Aff. ¶¶ 39-40, 42; Docket No. 66, pt. 5 at 25. Over the remainder of Whitcomb's placement at Five Points, he continued to receive the extra-strength Tylenol three times a day and had no further recorded complaints of pain. Gregoire Aff. ¶¶ 43-49; Docket No. 66, pt. 5 at 25-27, 30, 35.

### II. Discussion [7]

In his amended complaint, Whitcomb alleges eight claims. First, Whitcomb alleges multiple Constitutional violations, including that (1) his Eighth Amendment rights were violated by defendants' deliberately indifferent medical treatment, (2) he was denied equal protection of the law due to his status as a prisoner, and (3) his First, Fifth, and Thirteenth Amendment rights were violated. Additionally, Whitcomb contends that he was discriminated against under § 1981, he was the victim of a conspiracy of which other defendants were aware and failed to intervene, and he was not provided the reasonable accommodations required by the ADA. Defendants move for summary judgment as to all claims.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden

to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### A. First, Fifth & Thirteenth Amendments

**\*9** Whitcomb includes in his amended complaint a claim that defendants' conduct violated his rights under the First, Fifth, and Thirteenth Amendments.

The First Amendment ensures the freedom of religion, speech, assembly, and the press. U.S. CONST. amend. I. However, there are no claims asserted herein which deal with any of those topics. Thus, the First Amendment has no application to the allegations of Whitcomb's amended complaint and his First Amendment claim should, therefore, be dismissed.

The Fifth Amendment pertains to criminal charges and prohibits the federal government from violating a person's due process rights. *See Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461 (1952); *Am. Bankers Mortgage v. Fed. Home Loan Mortgage,* 75 F.3d 1401, 1406 (9th Cir.1996); *Birdsall v. City of Hartford,* 249 F.Supp.2d 163, 170 (D.Conn.2003). The claims asserted here concern events at county and state facilities allegedly committed by county and state employees. Thus, the Fifth Amendment has no application to the allegations of Whitcomb's amended complaint and his Fifth Amendment claim should be dismissed.

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States." U.S. CONST. amend. XIII. The Thirteenth "Amendment excludes involuntary servitude imposed as legal punishment for a crime." *Jackson v. Ricks,* No. 9:02-CV-00773 (GLS/GHL), 2006 **WL** 2023570, at \*26 (N.D.N.Y. July 18, 2006) (*citing United States v. Kozminski,* 487 U.S. 931, 943 (1988)). Thus, the Thirteenth Amendment has no application to the allegations of Whitcomb's amended complaint and his Thirteenth Amendment claim should, therefore, be dismissed.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk

to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*10** " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV-1089 (GLS/RFT), 2006 **WL** 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### 1. Oswego County Correctional Facility

Whitcomb claims that Thompson, Todd, Demm, and Delaney were deliberately indifferent to the post-operative wound. He contends that due to their indifference, the wound became severely infected causing Whitcomb to undergo an immediate surgical procedure and causing University physicians to continue recommending surgery and amputation. Defendants contend that there was no deliberate indifference.

As to the first prong, Whitcomb has offered evidence sufficient to establish that his injuries constituted serious medical needs. *See Scott v. Goord,* No. 01-CV-847 (LTS/AJP), 2004 **WL** 2403853, at \*9 (S.D.N.Y. Oct, 27, 2004) (holding that osteomyelitis, including persistent joint pain, inability to ambulate, and extreme tissue loss, was sufficiently serious to support his Eighth Amendment claim). Additionally, it is clear that a reasonable medical professional would recommend treatment for this condition as Whitcomb was attended by nurses and physicians multiple times per day. Furthermore, this condition allegedly affected Whitcomb's ability to bathe and, at a minimum, required him to pause whatever he was undertaking throughout the day to undergo multiple wound dressing changes and the administration of antibiotics. While it is unclear whether the pain was substantial, there is little dispute that it was chronic.

**\*11** However, even if Whitcomb suffered from a serious medical need, it cannot be said that any of the defendants were deliberately indifferent to his needs. While Whitcomb was incarcerated at OCCF, he was seen by medical personnel, including Demm and Delany, every day, multiple times, to have his medication administered and wound dressings changed. Additionally, in the ten months that Whitcomb was in the OCCF infirmary, he was attended to by Thompson approximately seventeen times, sent for an x-ray, MRI, and bone scan, and sent to University approximately seven times. Thompson Aff. ¶¶ 8, 12-13, 15, 18-19, 25-29, 34, 38, 41; Docket No. 68, pt. 15 at 4-5, 10, 13, 15-16, 18-19, 26-27, 31, 33, 35, 37, 47; Docket No. 68, pt. 16 at 34, 51-52, 63-64. Moreover, Thompson obtained appointments for Whitcomb with an orthopaedist and infectious disease physician after the Syracuse VA and University initially declined to evaluate Whitcomb. Thompson Aff. ¶¶ 19; Docket No. 68, pt. 15 at 18-19, 51-52.

Defendants clearly did not intentionally delay, deny, or interfere with Whitcomb's treatment as is evidenced by their constant participation in his care and their repeated telephone calls for referrals and recommendations to providers to evaluate a prisoner. Any delay caused by Whitcomb's status as a prisoner was not due to any defendant, if anything, it was

remedied by their persistence earlier than Whitcomb could reasonably have expected. Thus, Whitcomb's conclusory assertions that he received inadequate medical attention is contradicted by all other documentary evidence and fails to constitute evidence sufficient to raise issues of fact. *See Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1997) (granting summary judgment where "plaintiff's affidavit and deposition ... [did] not contain facts involving manifestations of ... deliberate indifference...."). Moreover, even if any defendant's actions were solely responsible for the infection and its progression, such defendant's actions are at best medical malpractice which, as previously discussed, is insufficient to establish an Eighth Amendment claim.

Accordingly, it is recommended that the motions of Thompson and the County defendants be granted on this ground.

### 2. Five Points Correctional Facility

Whitcomb claims that Gregoire was deliberately indifferent to the chronic pain he experienced due to his degenerative back condition. Whitcomb claims that the only pain reliever that worked adequately was Percocet, a narcotic which he had been prescribed prior to his incarceration. Gregoire contends that there was no deliberate indifference.

As to the first prong, Whitcomb appears to offer sufficient evidence to present a serious medical need. As Whitcomb's medical record indicates, he was suffering from "degenerative changes of the thoracic and lumbar spine" which, upon a subsequent x-ray read by another physician, confirmed that Whitcomb was suffering from an appreciable back ailment. Docket No. 68, pt. 16 at 27; Whitcomb Dep. at 100. Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); *see also, Farraday v. Lantz,* No. 03-CV-1520 (SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that "persistent[ ] complain [ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need).

**\*12** However, even if Whitcomb was suffering from a serious medical need, he has not proffered sufficient evidence to establish that Gregoire was deliberately indifferent to his needs. According to Whitcomb's own testimony, he saw Gregoire nearly every day. Whitcomb Dep. at 100. In the almost two months that Whitcomb was a patient in the infirmary, there were nine instances of complaints of back pain. Gregoire Aff. ¶¶ 10-20, 28, 36, 38-40, 42; Docket No. 66, pt. 5 at 14-17, 19, 21-22, 24-27. Every other medical entry for the remaining fifty days shows that Whitcomb had no complaints of pain. More importantly, when these complaints were made, Whitcomb was immediately offered and accepted pain medication on five occasions, was quickly tested and found to be negative for a suspected kidney infection on another occasion, was prescribed non-narcotic pain medication, and was functionally evaluated on two occasions and found to be able to transfer between the bed and wheelchair quickly, easily, and without any apparent discomfort. Gregoire Aff. ¶¶ 10-20, 28, 36, 38-40, 42; Docket No. 66, pt. 5 at 14-17, 19, 21-22, 24-27.

Based on these immediate interventions, evaluations, and the provision of multiple non-narcotic forms of pain medication, it cannot be said that Gregoire intentionally delayed, denied, or interfered with Whitcomb's treatment. Thus, Whitcomb's conclusory assertions that he received inadequate medical attention, absent other evidence, fails to constitute evidence sufficient to raise issues of fact. *See Williams,* 650 F.Supp. at 957. Furthermore, it appears that the gravamen of Whitcomb's complaint is that the two occasions when he requested Percocet, his requests were denied and other non-narcotic medications were offered and provided. Whitcomb disagreed with this decision. However, as discussed above, disagreements between a prisoner and physician over the type of pain medication prescribed affords an insufficient basis for a § 1983 claim.

Accordingly, it is recommended that Gregoire's motion be granted on this ground.

### D. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be

treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 **WL** 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005).

**\*13** Here, it appears that Whitcomb's claim is based on his allegations of verbal harassment by Delaney and discrimination based upon his status as a violent criminal.[8] However, these contentions fail for two reasons. First, "prisoners [do not] ... comprise a protected class for Equal Protection purposes." *See Mosby v. Trabout,* No. 06-CV-1165 (NAM/GHL), 2008 **WL** 623122, at *11 (N.D.N.Y. Mar. 4, 2008) (citations omitted). Second, verbal harassment which "alone, unaccompanied by an injury no natter how inappropriate, unprofessional, or reprehensible ..., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 **WL** 956941, at *8 (N.D.N.Y. Mar. 29, 2007). Moreover, the allegations that Whitcomb was denied equal protection are vague and conclusory at best, and thus have failed sufficiently to show an equal protection violation. *See De Jesus v. Sears Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996).

Accordingly, the motions of Thompson and the County defendants for summary judgment should be granted as to this claim.

### E. Conspiracy

Thompson and the County defendants assert that Whitcomb has failed to state a cause of action against them in both his §§ 1985 and 1986 claims. It appears that Whitcomb contends that all defendants participated in a conspiracy to deny him medical care, perpetuate his pain, and humiliate and discriminate against him.

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). In order to demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.,* No. 00-CV-3667 (RWS), 2001 **WL** 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Whitcomb does not assert any facts giving rise to a conspiracy. First, Whitcomb vaguely asserts conclusory statements relating to an alleged conspiracy between Thompson, Gregoire, Todd, and Demm. This is insufficient. *See X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). Moreover, there are no allegations relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent to deprive Whitcomb of privileges of the law. Additionally, Whitcomb vaguely alleges that Delaney discriminated against him because of the crime that he committed, second degree murder. However, violent offenders have not been afforded protection under ¶ 1985 as they are not a class able to benefit from these protections. *See Parks v. Edwards,* Nos. No. 03-CV-5588 & -6234(JG), 2004 **WL** 377658, at *4 (E.D.N.Y. Mar. 1, 2004).

**\*14** Additionally, Whitcomb has asserted a claim for negligent failure to prevent the deprivation of his rights. If any defendant "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ..., [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). No such viable claim exists here.

Therefore, the motions of Thompson and the County defendants should be granted on this ground.

### F. 42 U.S.C. § 1981

Section 1981 is a statement of equal rights, ensuring that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a).

> To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993).

Whitcomb has neither alleged nor proven the elements of this cause of action. First and foremost, Whitcomb is a Caucasian male and thus not a member of a racial minority. Todd Aff. (Docket No. 67, pt. 16) ¶ 2. Additionally, any discrimination which Whitcomb alleges was based upon his status as a convicted criminal and not his race likewise affords no basis for relief under this statute.

Accordingly, the motions of Thompson and the County defendants for summary judgment should be granted on this ground.

### G. ADA Claim

Title II of the ADA provides that "no qualified individual with a disability, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to state inmates. *Giraldi v. Bd. of Parole,* No. 04-CV-877 (FJS/DRH), 2008 **WL** 907321, at *5 (N.D.N.Y. Mar. 31, 2008) (citations omitted). To state a claim under the ADA, an inmate must demonstrate that "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity." *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995); 42 U.S.C. § 12132.

**\*15** In this case, Whitcomb has not and cannot prove the second element of the statute. Whitcomb's allegations of discrimination were solely based on his status as a convicted criminal. There were never any allegations that any of the alleged constitutional violations were motivated by Whitcomb's status as a paraplegic. Moreover, there is no proof that Whitcomb was denied any benefits by any defendant. Whitcomb received an abundance of medical care and was provided a wheelchair, 3-in-1 chair to assist him in the bathroom, and egg crates for his mattress. When Whitcomb was unhappy with the shower chair which was timely provided to him because it was not the chair of his choice, Whitcomb was permitted to bring his own personal chair to the prison. These actions do not show a denial of services.

Accordingly, the motions of Thompson and the County defendants should be granted on this ground.

### H. Personal Involvement

Todd contends that Whitcomb failed to establish his personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Whitcomb alleges that Todd was personally involved because he was the direct supervisor of Thompson and the County defendants. Am. Compl. at 20. As discussed above, Todd cannot be liable solely because he held a position of authority over other defendants. He was also not present in the medical department at any time, including those times when Whitcomb was receiving treatment. Thus, it is impossible to place liability on him for being directly involved.

Moreover, there are no indications that Todd created an unconstitutional policy or custom or was grossly negligent in supervising. Whitcomb makes conclusory and unsubstantiated statements about his knowledge of alleged unconstitutional care and a failure to intervene. However, these conclusory statements are insufficient to dispute defendants' expertise without something more to controvert the record.

*16 Therefore, it is recommended that Todd's motion for summary judgment on this ground be granted.

## I. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525, at *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

In this case, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Whitcomb's allegations as true, he has not shown that defendants violated his constitutional rights. In the alternative, therefore, defendants' motion on this ground should be granted.

## III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motions for summary judgment (Docket Nos. 66-68) each be **GRANTED** in all respects and that judgment be entered for all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v.* *Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## Footnotes

1    It appears that the correct spelling is "Gregoire." *See* Gregoire 1 e Mem. of Law (Docket No. 66, pt. 6) at 1 n. 1. The correct spelling will by used herein.

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    It appears from the docket that defendants Delaney and Demm have never been served with process. However, Delaney and Demm filed an answer and preserved their argument for lack of personal jurisdiction. *See* Docket No. 43. As discussed *infra,* defendants' motion for summary judgment should be granted on the merits. Thus, the jurisdictional argument need not be addressed.

4    Serous drainage is a "wound healing byproduct that the body creates to help dilute the toxic produced by bacteria and ... dying cells ..., helps carry plasma proteins and leukocytes to the wound site ..., [and] assists in removing ... toxins, dead cells, debris, and other products of inflammation." Pilonidal Support Alliance (visited Aug. 1, 2008) <http://www.pilonidal.org/aftercare/drainage.htm>.

5    MRSA is "a strain of staph that's resistant to the broad-spectrum antibiotics commonly used to treat it [and] ... can be fatal." the Mayo Clinic, Tools for Healthier Lives (visited Aug. 1, 2008) <http:// www.mayoclinic.com/health/mrsa/DS00735>.

6    As defendant Gregoire explains:

    Percocet is a controlled substance and a narcotic. I did not prescribe percocet to [Whitcomb] for pain because ... he did not require it ...; however, [I] prescribe[d] a variety of pain relievers for [Whitcomb's] back pain, including naprosyn, neurontin, tylenol, and an antidepressant to help with his adjustment to prison and with pain.

    Gregoire Aff. ¶ 8.

7    All defendants argue that Whitcomb has failed to exhaust his administrative remedies and is thus barred from suit. As discussed *infra,* it is recommended herein that all defendants' motions be granted on the merits. Therefore, defendants' exhaustion arguments need not be addressed unless the disposition recommended herein is rejected..

8    Whitcomb is serving a sentence of twenty-two years to life imprisonment upon his conviction for second-degree murder. *See* N.Y. State DOCS Inmate Information (visited Aug. 4, 2008) <http:// nyslookup.docs.state.ny.us/.GCAOOPOO/W IQ1/W I NQOOO>.

---

End of Document                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.